# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 44800

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | Boise, June 2017 Term |
| Plaintiff-Respondent, | ) ) | |
| | ) | 2017 Opinion No. 94 |
| v. | ) ) | |
| | ) | Filed: August 24, 2017 |
| MATTHEW ELLIOT COHAGAN, | ) ) | |
| Defendant-Appellant. | ) ) | Karel A. Lehrman, Clerk |

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Hon. Thomas J. Ryan, District Judge.

The district court order denying the motion to suppress is <u>reversed</u> and the case is <u>remanded</u> for proceedings consistent with this opinion.

Eric D. Fredericksen, State Appellate Public Defender, Boise, for appellant. Maya P. Waldron argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. Jessica M. Lorello, argued.

_____

HORTON, Justice.

Matthew Elliot Cohagan appeals the Canyon County district court's denial of his motion to suppress. Following the denial of his motion, Cohagan entered a conditional guilty plea to possession of methamphetamine. The appeal was originally assigned to the Idaho Court of Appeals, which reversed the district court. This Court granted the State's timely petition for review. We reverse the district court's order denying Cohagan's motion to suppress.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On February 26, 2014, Officers Curtis and Otto observed Matthew Elliot Cohagan on the southwest corner of 12th Avenue South and 7th Street South in Nampa, Idaho. As they drove by, Officer Curtis thought Cohagan resembled an individual who had an outstanding arrest warrant. Officers Curtis and Otto turned their vehicle around to get a better look at Cohagan. However, by the time they drove back through the intersection, Cohagan had entered a grocery store located on the same corner.

1

The officers entered the grocery store and Officer Otto, without Officer Curtis present, made contact with Cohagan. Officer Otto requested Cohagan's driver's license, and Cohagan complied. After inspecting Cohagan's license, Officer Otto determined that Cohagan was not the individual Officer Curtis suspected had an outstanding arrest warrant. Both officers then left the store.

Before leaving the parking lot, however, the officers received a radio request to go back into the grocery store and retrieve surveillance video for an unrelated incident. While Officer Otto went to obtain the requested video, Officer Curtis decided he wanted to confirm Officer Otto's identification of Cohagan. Officer Curtis stated that he felt Cohagan might have given Officer Otto false identification and, because Officer Otto was new to the force, Officer Curtis wanted to confirm that Cohagan was not the person he suspected had an outstanding arrest warrant. Officer Curtis found Cohagan shopping in one of the aisles. Officer Curtis testified that as he approached Cohagan he recognized that Cohagan was not the individual he suspected. However, Officer Curtis decided he still wanted to ask Cohagan his name and look at his identification.

Officer Curtis activated his lapel camera and made contact with Cohagan. The video shows that Officer Curtis asked if he could see Cohagan's identification. Cohagan replied "absolutely man" and handed his identification to Officer Curtis. Officer Curtis then took Cohagan's identification, told Cohagan that he resembled another man they were looking for, and asked Cohagan if he had any outstanding warrants. Cohagan stated that he did not. Officer Curtis replied that he was going to check to see if Cohagan had any warrants and radioed dispatch to run a warrant check.

While Officer Curtis waited for dispatch to respond to the warrant check, Cohagan asked if he could continue shopping. Officer Curtis told Cohagan that he could, and Cohagan began walking away. Seconds later, however, Officer Curtis appeared to receive notice from dispatch that Cohagan might have a warrant and stated, "Hey, come here, they're telling me you might have a warrant. I don't want you running around the store here." Officer Curtis then quickly caught up to Cohagan, put his hand on Cohagan's shoulder, and told Cohagan to walk to the front of the store. On the way to the front of the store, Officer Curtis and Cohagan were joined by Officer Otto, and the three of them then stood at the front of the store and waited until the warrants were confirmed. Once the warrants were confirmed, Cohagan was escorted out of the

store and arrested. During the search incident to arrest, officers discovered a yellow box containing a glass-smoking device with white crystal residue that tested positive for methamphetamine.

Cohagan was charged with possession of methamphetamine. He promptly filed a motion to suppress all evidence seized as a result of his arrest. The State conceded that Cohagan was illegally seized when Officer Curtis retained his license to run a warrant check, but argued that suppression was unwarranted because the discovery of methamphetamine was sufficiently attenuated from the illegal seizure. The district court denied Cohagan's motion to suppress because it found that the discovery of the outstanding warrant was an intervening circumstance that sufficiently purged the discovery of the methamphetamine from the taint of the illegal seizure.

Following the denial of his motion, Cohagan entered a conditional guilty plea to possession of methamphetamine, reserving his right to appeal the denial of his motion to suppress. The Court of Appeals reversed. We granted the State's timely petition for review.

## II.    STANDARD OF REVIEW

> "In cases that come before this Court on a petition for review of a Court of Appeals decision, this Court gives serious consideration to the views of the Court of Appeals, but directly reviews the decision of the lower court." *State v. Oliver*, 144 Idaho 722, 724, 170 P.3d 387, 389 (2007). "This Court thus acts as if the case were on direct appeal from the district court." *State v. James*, 148 Idaho 574, 576, 225 P.3d 1169, 1171 (2010). "In reviewing a district court order granting or denying a motion to suppress evidence, the standard of review is bifurcated." *Id.* (quoting *State v. Purdum*, 147 Idaho 206, 207, 207 P.3d 182, 183 (2009)). "This Court will accept the trial court's findings of fact unless they are clearly erroneous." *Id.* "However, this Court may freely review the trial court's application of constitutional principles in light of the facts found." *Id.*

*State v. Garcia-Rodriguez*, No. 44443, 2017 WL 2569786, at *2 (Idaho June 14, 2017).

## III.    ANALYSIS

Cohagan asserts the district court erred in denying his suppression motion. Specifically, Cohagan argues that the evidence seized when he was arrested should have been suppressed because it was "the direct result of the illegal detention because Officer Curtis detained [him] so that he could run a warrant check."

**A. Whether the district court erred in denying Cohagan's suppression motion under the Fourth Amendment.**

3

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. It has been incorporated through the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution to apply to the states. *Mapp v. Ohio*, 367 U.S. 643, 654–55 (1961).[1] Evidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule, which requires unlawfully seized evidence to be excluded from trial. *E.g.*, *Wong Sun v. United States*, 371 U.S. 471, 485 (1963); *State v. Page*, 140 Idaho 841, 846, 103 P.3d 454, 459 (2004). The exclusionary rule requires the suppression of both "primary evidence obtained as a direct result of an illegal search or seizure" and, pertinent here, "evidence later discovered and found to be derivative of an illegality," the proverbial " 'fruit of the poisonous tree.' " *Segura v. United States*, 468 U.S. 796, 804 (1984); *accord, e.g.*, *State v. Bishop*, 146 Idaho 804, 810–11, 203 P.3d 1203, 1209–10 (2009).

However, there are various exceptions to the exclusionary rule. *See, e.g.*, *Murray v. United States*, 487 U.S. 533, 537 (1988) (describing the independent source doctrine); *Nix v. Williams*, 467 U.S. 431, 443–44 (1984) (describing the inevitable discovery doctrine). At issue here is the attenuation doctrine. The attenuation doctrine allows evidence to be admitted "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.' " *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

As a threshold matter, the State maintains on appeal, even though it conceded the point below, that the Court must decide whether the interaction between Cohagan and Officer Curtis was lawful. This is incorrect. It is true that the question of whether a seizure occurred is a question of law over which we exercise free review. *State v. Bainbridge*, 117 Idaho 245, 247, 787 P.2d 231, 233 (1990). It is also true that this Court is not "limited by the prosecutor's argument or the absence thereof." *State v. Veneroso*, 138 Idaho 925, 930, 71 P.3d 1072, 1077 (Ct. App. 2003). However, it is equally true that "[i]ssues not raised below will not be considered

---

[1] The Idaho Constitution offers protection for unlawful search and seizure as well. Idaho Const. art. I, § 17. However, Cohagan does not argue that Idaho's Constitution provides greater protection than the U.S. Constitution; thus, our analysis is limited to the Fourth Amendment to the U.S. Constitution. *In re Doe*, 155 Idaho 36, 39 n.2, 304 P.3d 1202, 1205 n.2 (2013).

by this court on appeal, and the parties will be held to the theory upon which the case was presented to the lower court." *Garcia-Rodriguez*, 2017 WL 2569786 at *3 (quoting *Heckman Ranches, Inc. v. State, By & Through Dep't of Pub. Lands*, 99 Idaho 793, 799–800, 589 P.2d 540, 546–47 (1979)); *see also Weil v. Herring*, 175 S.E. 836, 838 (N.C. 1934) ("An examination of the record discloses that the cause was not tried upon that theory, and the law does not permit parties to swap horses between courts in order to get a better mount in the Supreme Court.").

In its briefing before the district court, the State stated that it "concedes that [Cohagan] was unjustifiably seized at the point Officer Curtis chose to retain his license and hold it while running [Cohagan's] information for active warrants."[2] To allow the State to change positions on appeal and argue that the stop was not illegal would sharply cut against our longstanding and recently re-affirmed policy of requiring parties to present their arguments to the court below:

> It is manifestly unfair for a party to go into court and slumber, as it were, on his defense, take no exception to the ruling, present no point for the attention of the court, and seek to present his defense, that was never mooted before, to the judgment of the appellate court. Such a practice would destroy the purpose of an appeal and make the supreme court one for deciding questions of law in the first instance.

*Garcia-Rodriguez*, 2017 WL 2569786 at *4 (quoting *Smith v. Sterling*, 1 Idaho 128, 131 (1867)).

As we will discuss further when considering the State's claim of attenuation, Officer Curtis's retention of Cohagan's license resulted in an unlawful detention. We therefore proceed to the question of attenuation: i.e., whether the discovery of the warrant sufficiently breaks the causal chain between the unlawful stop and the discovery of the evidence. *See Strieff*, 136 S. Ct. at 2062 (proceeding to the analysis of the attenuation factors without deciding whether the stop was illegal because the State conceded the point).

1. **Whether the discovery of the arrest warrant was a sufficient intervening event to break the causal chain between the unlawful stop and the discovery of the evidence.**

"There are three factors for a court to consider when determining whether unlawful conduct has been adequately attenuated." *Page*, 140 Idaho at 846, 103 P.3d at 459; *see also Brown v. Illinois*, 422 U.S. 590, 603–04 (1975). Those factors are: "(1) the elapsed time between the misconduct and the acquisition of the evidence, (2) the occurrence of intervening circumstances, and (3) the flagrancy and purpose of the improper law enforcement action." *Page*,

---

[2] The State also stated at the hearing on the motion to suppress: "[W]e admit holding the ID was probably a seizure; we do admit that." And, "Now as I indicated, the state admits that once the officer has that ID, under the law that is a seizure."

140 Idaho at 846, 103 P.3d at 459; *accord, e.g.*, *Brown*, 422 U.S. at 603–04; *Strieff*, 136 S. Ct. at 2062.

a. Elapsed time

In addressing the first factor, the district court found "there was a minimal lapse of time between the seizure of the license and the discovery [of] a valid arrest warrant." The district court, however, looked to the wrong period of time. It is not the period of time between the misconduct and the intervening circumstance that matters. Rather, as this Court and the U.S. Supreme Court have both stated, the period of time to consider is "the elapsed time between the misconduct and the acquisition of the evidence." *Page*, 140 Idaho at 846, 103 P.3d at 459; *Strieff*, 136 S. Ct. at 2062 ("First, we look to the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence . . . ."). "[T]his factor favors attenuation unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." *Strieff*, 136 S. Ct. at 2062 (citing *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (per curiam))).

Here, drug contraband was discovered on Cohagan's person within minutes of the illegal stop. Such a short period of time between the illegal stop and the discovery of evidence weighs in favor of suppression. *Id.* (noting that the space of minutes between the misconduct and the discovery of evidence "counsels in favor of suppression").

b. Intervening circumstances

The intervening circumstance, in this case, is the discovery of an arrest warrant for Cohagan. The discovery of an arrest warrant as an intervening circumstance "strongly favors the State." *Id.* "Where the discovery of an arrest warrant constitutes an intervening circumstance, 'it is an even more compelling case for the conclusion that the taint of the original illegality is dissipated.' " *United States v. Simpson*, 439 F.3d 490, 495 (8th Cir. 2006) (quoting *United States v. Green*, 111 F.3d 515, 522 (7th Cir. 1997)).

Here, it is undisputed that the arrest warrant was valid. Indeed, counsel for Cohagan admitted at the suppression hearing that there were actually three warrants. "[A] warrant valid on its face is prima facie sufficient authority for the officer to arrest and deliver the accused." *In re Martz*, 83 Idaho 72, 75, 357 P.2d 940, 942 (1960). Furthermore, in *Monson v. Boyd*, this Court held that the existence of a valid arrest warrant imposes a duty on peace officers to make an arrest. 81 Idaho 575, 579, 348 P.2d 93, 95 (1959) ("Plaintiff contends that the word 'may' in the foregoing statute is permissive only, and does not charge the peace officer with a duty to make

an arrest. On the contrary, we think the statute imposes a duty on peace officers."); *accord Strieff*, 136 S. Ct. at 2062 ("A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions." (quoting *United States v. Leon*, 468 U.S. 897, 920 n.21 (1984))). Thus, the discovery of the outstanding warrant, independent of the stop, compelled Cohagan's arrest. And there is no question that the search that revealed the drug contraband was lawful as a search incident to arrest. *See State v. LaMay*, 140 Idaho 835, 838, 103 P.3d 448, 451 (2004); *Arizona v. Gant*, 556 U.S. 332, 339 (2009). Accordingly, this factor weighs strongly in favor of attenuation. *Strieff*, 136 S. Ct. at 2062; *Simpson*, 439 F.3d at 495.

  c. <u>Flagrancy and purpose</u>

  The purpose of the exclusionary rule, under federal law, is to deter police misconduct.[3] *Davis v. United States*, 564 U.S. 229, 236–37. Accordingly, the third factor only favors exclusion "when the police misconduct is most in need of deterrence—that is, when it is *purposeful* or *flagrant*." *Strieff*, 136 S. Ct. at 2062 (emphases added).

  The State argues that the recent U.S. Supreme Court decision in *Strieff* controls the outcome of this case and dictates that we find attenuation rather than suppression. Because Cohagan has not argued that the Idaho Constitution affords greater protection than the U.S. Constitution, we agree that *Strieff* controls. However, *Strieff* differs factually from the present case, and we hold that those differences are sufficient to warrant suppression.

  In *Strieff*, an officer received an anonymous tip about drug activity occurring in a residence. *Id.* at 2059. Over the course of a week, and after observing multiple people make brief visits to the residence, the officer became suspicious that the occupants of the residence were dealing drugs. *Id.* While watching the home, the officer observed the defendant exit the house and walk toward a nearby convenience store. *Id.* at 2060. The officer detained the defendant in the store parking lot and asked the defendant what he was doing at the residence. *Id.* The officer

---

[3] In *State v. Guzman*, 122 Idaho 981, 988–98, 842 P.2d 660, 667–77 (1992), this Court declined to accept deterrence of police misconduct as the sole purpose of the exclusionary rule under Idaho's Constitution; rather, we instructed that the exclusionary rule serves to:

> 1) provide an effective remedy to persons who have been subjected to an unreasonable government search and/or seizure; 2) deter the police from acting unlawfully in obtaining evidence; 3) encourage thoroughness in the warrant issuing process; 4) avoid having the judiciary commit an additional constitutional violation by considering evidence which has been obtained through illegal means; and 5) preserve judicial integrity.

*Id.* at 993, 842 P.2d at 672.
However, as noted, Cohagan makes no argument concerning the Idaho Constitution.

also requested the defendant's identification and relayed the defendant's information to dispatch, which reported that the defendant had an outstanding arrest warrant. *Id.* The officer then arrested the defendant and searched him incident to arrest. *Id.* The search revealed a baggie of methamphetamine and drug paraphernalia. *Id.*

In determining whether the officer's conduct was flagrant, the Supreme Court noted that the officer's decision to run a warrant check was a " 'negligibly burdensome precaution' for officer safety" and the officer's conduct "was at most negligent" and the result of "two good-faith mistakes." *Id.* at 2063 (quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2016)). It also noted that the officer's purpose in approaching the defendant was to determine what was going on in the house and that "the stop was an isolated instance of negligence that occurred in connection with a bona fide investigation of a suspected drug house." *Id.* Based on those observations, the Supreme Court held that the officer's conduct did not reflect "flagrantly unlawful police misconduct." *Id.*

Here, there was no "bona fide investigation." Officer Otto had asked Cohagan for his identification just a few minutes before Officer Curtis interacted with Cohagan and confirmed that Cohagan was not the person they suspected. The only proffered purpose for Officer Curtis's stop of Cohagan was that Officer Curtis suspected that Cohagan might have given Officer Otto a false identification card, but there are no objective grounds to support this belief or the subsequent seizure. *Cf. State v. Henage*, 143 Idaho 655, 660–62, 152 P.3d 16, 21–23 (2007). Indeed, Officer Curtis admitted that before stopping Cohagan, he knew Cohagan was not the person he suspected.[4] Thus, there was no cause for Officer Curtis to stop Cohagan because both Officer Otto and Officer Curtis himself had already confirmed that Cohagan was not the suspected individual. Further, there was no need for Officer Curtis to stop Cohagan and run a warrant check as a precaution for officer safety. Officer Otto had just checked Cohagan's identification and there was no reason Officer Curtis could not have run a warrant check before he made contact with Cohagan. Indeed, the more prudent and safe approach for Officer Curtis would have been to check for warrants before making contact.

Ultimately, there was simply no reason for Officer Curtis to stop Cohagan and run a warrant check. Unlike in *Strieff*, where the defendant had just exited a residence the officer

---

[4] Officer Curtis testified: "So as [Cohagan] got close, maybe 10 or 15 feet away, I realized it was not him, but at that point I still wanted to ask his name and ID him."

suspected was a source of drugs, here, there was no indication that Cohagan was involved in illegal activity. Also unlike in *Strieff*, where the officer did not already know the defendant's name, Officer Otto had already identified Cohagan and there was no reason Officer Curtis could not have run a warrant check before stopping Cohagan. As Officer Curtis stated: "So as [Cohagan] got close, maybe 10 or 15 feet away, I realized it was not him, but at that point I still wanted to ask his name and ID him." Having already stated his realization that Cohagan was not the suspected person, Officer Curtis's decision to request Cohagan's identification and run a warrant check was nothing more than "a suspicionless fishing expedition 'in the hope that something would turn up.' " *Id.* at 2064 (quoting *Taylor v. Alabama*, 457 U.S. 687, 691 (1982)). Such purposeful conduct is simply untenable and is exactly the type of flagrantly unlawful conduct the Fourth Amendment is designed to protect against. *See, e.g.*, *Kaupp v. Texas*, 538 U.S. 626, 633, 123 S. Ct. 1843, 1848 (2003) (finding flagrant violation where officers knew they lacked probable cause to detain the defendant but did so anyway); *Brown v. Illinois*, 422 U.S. 590, 605 (1975) (holding that a stop that was solely investigatory and conducted on the hope that something might turn up violates the protections of the Fourth Amendment).

Our decision in *State v. Page*, 140 Idaho 841, 103 P.3d 454 (2004), warrants further discussion when evaluating Officer Curtis's conduct.

In *Page*, a police officer noticed Page walking down the middle of a street in the middle of the night. *Id*. at 842, 103 P.3d at 455. The officer approached Page and, "[a]fter inquiring about his well-being," asked for Page's identification. *Id*. at 842–43, 103 P.3d at 455–56. The officer took Page's driver's license back to his patrol car and contacted dispatch. *Id*. at 843, 103 P.3d at 456. After dispatch informed the officer that Page had an outstanding warrant for his arrest, the officer arrested Page. *Id*. The ensuing search incident to arrest led to the discovery of methamphetamine, marijuana and drug paraphernalia on Page's person. *Id*. Page moved to suppress the evidence. *Id*. The district court found that Page was unlawfully seized and granted his motion to suppress. *Id*.

We reversed. *Id*. at 847, 103 P.3d at 460. We agreed with the district court's determination that Page was unlawfully seized, *id*. at 845, 103 P.3d at 458, but held that the discovery of the outstanding warrant attenuated the taint of the unlawful seizure. *Id*. at 846–47, 103 P.3d at 459–60.

*Page* is important for its discussion of the illegal seizure. There, the State relied on our decision in *State v. Godwin*, 121 Idaho 491, 826 P.2d 452 (1992), in support of its argument that:

> the brief retention of a driver's license or other identifying paperwork during an otherwise lawful police contact is reasonable, because the intrusion upon the person's privacy interest is minimal when compared to the valid public/governmental interests, including the officer's need to properly identify the person with whom he is dealing, prepare accurate reports and ensure officer safety.

*Page*, 140 Idaho at 845, 103 P.3d at 458. We rejected this argument. We first distinguished *Godwin* from the facts presented in *Page*, noting:

> the Court in *Godwin* was heavily influenced by the fact that I.C. § 49-316 requires a driver to surrender a driver's license to a police officer upon demand and that the statutory authority for police to demand a driver's license would mean little if the police could not check the validity of the license.

*Id*. (internal quotation, citation and alteration omitted). We held that there was "[n]o equally compelling policy or statutory authority" that would support seizure of a driver's license from a pedestrian. *Id*. We then took note of our statement in *Godwin* "that 'police officers do not have unfettered discretion to stop drivers and request a display of a driver's license' to conduct a random status and/or warrants check." *Id*. (quoting *Godwin*, 121 Idaho at 496, 826 P.2d at 457). Most significantly, we expressed concern "about the implications of a rule allowing law enforcement officers the ability to initiate consensual encounters with pedestrians in order to seize identification and run a warrants check." *Id*.

It appears that our holding regarding the illegality of Page's seizure and the concern we identified has been obscured by the result of the decision—reversal of the district court's order suppressing the evidence. This leads us to discuss an implicit component of the exclusionary rule that receives little attention: the fact that application of the rule leads law enforcement officers to receive training in the law of search and seizure. The United States Supreme Court has explained:

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, *the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused*.

10

*Michigan v. Tucker*, 417 U.S. 433, 447 (1974) (emphasis added). In the landmark decision announcing the good-faith exception to the exclusionary rule, the United States Supreme Court explained:

> The objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits. *United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975). As Professor Jerold Israel has observed:
> "*The key to the [exclusionary] rule's effectiveness as a deterrent lies, I believe, in the impetus it has provided to police training programs that make officers aware of the limits imposed by the fourth amendment* and emphasize the need to operate within those limits. [An objective good-faith exception] is not likely to result in the elimination of such programs, which are now viewed as an important aspect of police professionalism. Neither is it likely to alter the tenor of those programs; the possibility that illegally obtained evidence may be admitted in borderline cases is unlikely to encourage police instructors to pay less attention to fourth amendment limitations. Finally, [it] should not encourage officers to pay less attention to what they are taught, as the requirement that the officer act in 'good faith' is inconsistent with closing one's mind to the possibility of illegality." Israel, [Criminal Procedure, the Burger Court, and the Legacy of the Warren Court, 75 Mich.L.Rev. 1319, 1412–1413 (1977)] (footnotes omitted).

*United States v. Leon*, 468 U.S. 897, 919 n.20 (1984) (emphasis added, bracketed material (except for Israel citation) in original).

Although the record is silent as to Officer Curtis's training, it appears that law enforcement's "takeaway" from our decision in *Page* may differ from that which this Court intended. Rather than recognizing the illegality of seizing identification belonging to a pedestrian not suspected of criminal conduct, *Page* may have been interpreted as granting law enforcement officers license to engage in fishing expeditions. Stated differently, it appears that some members of law enforcement have interpreted *Page* as meaning that this Court will apply the attenuation doctrine to excuse a constitutional violation in the event that a fishing expedition proves successful.

In our view, the training that law enforcement officers receive regarding the law of search and seizure should play a role in evaluating the flagrancy of their behavior. As the Arkansas Supreme Court has stated:

> It is the duty of those who enforce the law to follow it, and ignorance thereof can no more excuse the conduct of officers and judges than it would excuse the conduct of a defendant. If anything, a higher duty of compliance rests on those whose responsibility it is to enforce the law than on the general [populace].

*State v. Kelley*, 210 S.W.3d 93, 99 (Ark. 2005). Today's decision should remove any lingering doubt as to whether this Court will sanction the unjustified, suspicionless seizure of citizens. It is difficult to imagine how similar conduct, following the release of this opinion, can be characterized as anything but purposeful or flagrant.

In summary, although the discovery of the arrest warrant strongly favors attenuation, the other two factors support a finding of suppression. Accordingly, we hold that the discovery of the evidence was not sufficiently attenuated from the illegal stop as to break the causal chain between the unconstitutional stop and the discovery of the evidence. The district court's denial of Cohagan's motion to suppress is reversed.

## IV.    CONCLUSION

We reverse the district court's denial of Cohagan's motion to suppress and remand to the district court for further proceedings consistent with this opinion.

Chief Justice BURDICK and Justices EISMANN, JONES and BRODY, **CONCUR**.