# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 44617

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2018 Opinion No. 10 |
| | ) | |
| Plaintiff-Appellant, | ) | Filed: March 7, 2018 |
| | ) | |
| v. | ) | Karel A. Lehrman, Clerk |
| | ) | |
| TAYLOR JAMES FAIRCHILD, | ) | |
| | ) | |
| Defendant-Respondent. | ) | |
| | ) | |

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Hon. George A. Southworth, District Judge.

Order granting motion to suppress, affirmed in part and reversed in part.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for appellant. Kenneth K. Jorgensen argued.

Eric D. Fredericksen, State Appellate Public Defender; Reed P. Anderson, Deputy Appellate Public Defender, Boise, for respondent. Reed P. Anderson argued.

_____

HUSKEY, Judge

The State appeals from the district court's order granting Taylor James Fairchild's motion to suppress evidence of methamphetamine. The State argues: (1) the officer had reasonable suspicion to conduct an investigatory stop; and (2) even if the officer lacked reasonable suspicion, discovery of a valid arrest warrant attenuated the evidence from any unlawfulness. The district court's order granting Fairchild's motion to suppress is affirmed in part and reversed in part.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

A citizen contacted the sheriff's office to report what he thought was odd behavior. The citizen identified himself by name and provided his address. He asked, "I was wondering if I could have somebody sent out[?] I'm a little concerned about a transaction or something going down behind my house." He further explained, "two cars just come up really fast and pull

around and meet up and they get out and they're just both just sitting in the truck together . . . [.] It could be nothing but too often things happen back there and the way they pulled up so fast it looks like [unintelligible]." The location was the dead-end of a paved street after the last entrance to the neighborhood, which terminated at the edge of private, field property. Beyond the paved dead-end, a dirt path continued into the field. The paved dead-end provided no access to any other area unless a vehicle turned around and left the way it came.

The citizen further provided a description of the vehicles, including their license plate numbers. One of the vehicles was a Dodge Ram pickup and the other was a dark-colored Hyundai. An officer was dispatched to the area. While en route, the officer ran the license plate numbers and learned the pickup was registered to an individual the officer knew was a drug user. The officer testified that because two vehicles were involved, he requested an assisting officer to respond to the scene as well.

When the officer arrived, he saw the two vehicles driving away. The pickup drove away from the officer into the privately owned field. The Hyundai, driven by Fairchild, drove towards the officer away from the dead-end on the paved road. As it did so, the officer turned on his overhead lights and motioned the driver to stop. Fairchild stopped.

The officer walked over to Fairchild and asked for identification and Fairchild provided his driver's license. The officer communicated the information on the driver's license to dispatch. Dispatch reported an outstanding warrant for Fairchild, but stated it needed to confirm the warrant's existence and validity by viewing the original paperwork. While dispatch was confirming the warrant, the officer asked Fairchild questions. The questions included asking where Fairchild was coming from and whether he had interactions with the driver of the pickup. Fairchild said he was in the area, having spent the night with a friend who lived nearby, and denied any contact with the driver of the pickup. The officer then explained why he was in the area and continued to ask Fairchild why he was there. Fairchild continued to deny any contact with the pickup driver.

Finally, the officer asked Fairchild if he was on probation and Fairchild indicated that he was, for a paraphernalia charge. The officer asked Fairchild to step out of the car and asked Fairchild if he would consent to a search. Fairchild stepped out of the car. The officer conducted a pat-down frisk, but also reached into Fairchild's pocket. After reaching into Fairchild's pocket, the officer found a small baggie of a white, powdery substance which was

later confirmed to be methamphetamine. The officer then arrested Fairchild, placed him in handcuffs, and read him his *Miranda*[1] rights.

The assisting officer, who had since arrived on the scene, watched Fairchild as the original officer retrieved gloves from his patrol car. While at his patrol car, the original officer again contacted dispatch which confirmed that a valid warrant for Fairchild's arrest existed. The officer resumed searching Fairchild, discovering a second baggie of what was later confirmed to be methamphetamine.

Fairchild was charged with possession of a controlled substance. He filed a motion to suppress the methamphetamine evidence, reasoning that the officer did not have a reasonable suspicion to stop Fairchild. But even if the stop was valid, Fairchild argued, the stop subsequently exceeded the scope of the purpose of the original stop when the officer detained Fairchild while the officer ran a check for warrants. Finally, Fairchild argued there was no intervening circumstance that purged the taint of the initial illegality--either the stop or the continued detention--and specifically requested the drugs found in Fairchild's pocket incident to arrest be suppressed.

The State argued that even if there was no reasonable, articulable suspicion to stop and/or detain Fairchild, the evidence found was attenuated from the alleged police misconduct. The State specifically argued, "Assuming an illegal stop in Defendant's case, the discovery of the evidence was not the result of exploitation of the illegality. Rather, the taint of the unlawful conduct was sufficiently dissipated to allow admission of the evidence."

At the hearing on the motion to suppress, the district court asked the parties if the fact that the officer received information that there may have been a warrant, but did not receive verification that the warrant was valid and still in effect until after he had already searched Fairchild, made any difference concerning the attenuation doctrine. Based on this question, the State was permitted to submit an affidavit about this issue.

Thereafter, the State submitted additional briefing about the applicability of the attenuation doctrine after the officer was informed of the warrant but before the warrant had been confirmed. According to the State, "Dispatch notified the officer of a warrant against the Defendant. The officer received that notification prior to finding the first baggie of white crystal substance. However, Dispatch then had to confirm that the warrant was still valid and not just in

---

[1]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

their database." Further, "When notified of a warrant, they (i.e. law enforcement) would detain at that point, pending confirmation . . . ." The State goes on to note:

> There are two pieces of potential evidence in this case: two baggies of white crystal substance. The first baggie was found after the officer was notified of a warrant against Defendant. The second baggie was found after the officer received confirmation of that warrant from Dispatch. The State earlier argued that assuming law enforcement performed an illegal traffic stop of Defendant, the discovery of the evidence is admissible pursuant to the attenuation doctrine.
>
> The State recognizes that the Court may find it more difficult to apply the attenuation doctrine to the first baggie of substance inasmuch as the warrant had not yet been confirmed by Dispatch and Defendant was apparently not yet under arrest for that warrant.

Finally, the State argued that the first baggie was admissible under the inevitable discovery doctrine.

The district court granted Fairchild's motion to suppress, concluding the officer's investigatory stop was not justified by reasonable suspicion, but even if the stop was lawful, the frisk resulting in the discovery of the first baggie exceeded the scope of a limited pat-down. Next, the district court determined the attenuation doctrine did not apply to the discovery of the second baggie of methamphetamine. As a result, the district court granted Fairchild's motion to suppress both baggies of methamphetamine. The State timely appeals. The district court case was stayed pending the outcome of this appeal.

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

4

**III.**

**ANALYSIS**

The State asserts the district court erred when it granted Fairchild's motion to suppress. First, the State argues the totality of the circumstances supplied the officer with reasonable suspicion to conduct an investigatory stop. Second, the State argues that dispatch's initial report of a warrant was sufficient for the officer to arrest Fairchild and search him incident to that arrest, resulting in the discovery of both baggies of methamphetamine. Third, the State contends that, alternatively, if the officer did not have reasonable suspicion to conduct the investigatory stop, the discovery of Fairchild's warrant attenuated any unlawfulness of the stop from the discovery of the methamphetamine baggies.

**A.      The Officer Had Reasonable Suspicion to Stop Fairchild**

Investigatory detentions are permissible when justified by an officer's reasonable articulable suspicion that a person has committed, or is about to commit, a crime. *State v. Morgan*, 154 Idaho 109, 112, 294 P.3d 1121, 1124 (2013). "Reasonable suspicion must be based on specific, articulable facts and the rational inferences that can be drawn from those facts. Reasonable suspicion requires more than a mere hunch or inchoate and unparticularized suspicion." *Id.* (citations omitted). The reasonableness of the suspicion must be evaluated upon the totality of the circumstances at the time of the stop. *State v. Ferreira*, 133 Idaho 474, 483, 988 P.2d 700, 709 (Ct. App. 1999). This standard requires less than probable cause but more than mere speculation or instinct on the part of the officer. *Id.* An officer may draw reasonable inferences from the facts in his or her possession, and those inferences may be drawn from the officer's experience and law enforcement training. *State v. Montague*, 114 Idaho 319, 321, 756 P.2d 1083, 1085 (Ct. App. 1988). "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

An informant's tip to an officer may give rise to reasonable suspicion when it would warrant a man of reasonable caution in the belief that a stop was appropriate. *Alabama v. White*, 496 U.S. 325, 329 (1990) (citations omitted). Whether a tip amounts to reasonable suspicion depends on the substance, source, and reliability of the information provided; the more reliable the tip, the less information is required to establish reasonable suspicion. *State v. Swindle*, 148 Idaho 61, 65, 218 P.3d 790, 794 (Ct. App. 2009). Factors indicative of reliability include, among

5

others, whether the informant reveals his or her identity and the basis of his or her knowledge, whether the location of the informant is known, whether the information was based on firsthand observations of events as they were occurring, and whether the information the informant provided was subject to immediate confirmation or corroboration by law enforcement. *Id.*

To determine whether the officer had reasonable suspicion to conduct an investigatory stop with Fairchild, we look to the totality of the circumstances. The officer was responding to an informant's tip about what the informant thought was odd behavior: two vehicles pulled up very quickly into a paved, dead-end road, parked, and then the drivers sat in one of the cars for at least ten minutes, all in a place where the informant felt strange things happened too often. The informant exhibited numerous factors indicating reliability. First, the citizen revealed his identity by providing his name. Second, the citizen provided his address. Thus, if necessary, the officer could assess the citizen's credibility at a later time. Third, the citizen provided information based on his firsthand observation of the vehicles parked behind his house. Fourth, the information the citizen provided was immediately confirmed by the officer. While en route to the scene, the officer ran the license plate information the citizen provided and found the vehicles matched the citizen's description. Further, when the officer arrived at the scene, he viewed two vehicles that matched the description in the described location. Thus, the substance, source, and reliability of the citizen's tip provided, at minimum, a substantial step towards the officer's reasonable suspicion.

Beyond the information provided by the citizen, the officer independently made other observations. First, while running the license plate information en route to the scene, the officer discovered that the owner of the pickup was a drug user with whom the officer had previous experience. Second, upon the officer's arrival at the scene, he observed the vehicles driving away from the scene in different directions, the pickup across a privately owned field.

Together, these specific, articulable facts and the rational inference that the officer drew from the facts--that the drivers of the vehicles had just committed or were attempting to commit a drug crime--rise to the level of reasonable suspicion. When the officer stopped Fairchild, he was not merely acting according to a hunch, instinct, or speculation, but according to the facts which his experience and law enforcement training identified as reasonably suspicious.

Fairchild argues these facts were not certain enough to rise to the level of reasonable suspicion. Specifically, he narrows in on the informant's statements that there was a "transaction

6

or something" happening and that it "could be nothing but too often things happen back there" to argue that the informant himself was uncertain what the drivers of the vehicles were doing. Additionally, Fairchild contends that because the informant never saw either of the drivers consume drugs or exchange money, his information cannot lead to reasonable suspicion. Leaning on these arguments, the district court noted that the pickup driver could have been someone other than the pickup's owner. These arguments confuse uncertainty with a lack of reasonable suspicion and discount the purpose of the reasonable suspicion standard: to allow officers to proceed and "confirm or dispel" their suspicion of a crime. *State v. Williams*, 162 Idaho 56, 64, 394 P.3d 99, 107 (Ct. App. 2016). Indeed, Fairchild argues that reasonable suspicion cannot exist where there is a possibility that the witnessed conduct could be innocent in nature. This cannot be true. A determination that reasonable suspicion exists need not rule out the possibility of innocent conduct--an officer's actions during an investigatory stop will do that. *Navarette v. California*, ___ U.S. ___, 134 S. Ct. 1683, 1691 (2014). Otherwise, officers would be forced to divine the criminality of suspicious conduct without investigation.

The officer in this case, based on the specific and articulable facts above, properly proceeded to investigate Fairchild's conduct so he could confirm or dispel his suspicion that a drug crime had been attempted or committed. Therefore, the district court erred when it found the officer's stop of Fairchild was not justified by reasonable suspicion.

**B.** **Dispatch's Confirmation of the Existence of a Valid Warrant for Fairchild's Arrest Informs the Suppression Analysis**

The parties dispute whether the attenuation doctrine can be applied to the officer's discovery of the first baggie of methamphetamine, the second baggie, or both. The answer hinges upon the precise moment when the officer could validly arrest Fairchild pursuant to the warrant dispatch reported.

After considering the officer's testimony, the officer's affidavit, and the officer's body camera footage, the district court concluded that Fairchild's warrant was confirmed after the officer had discovered the first baggie of methamphetamine on Fairchild's person. Thus, the district court, taking this as the precise moment when the officer could validly arrest Fairchild, considered the attenuation doctrine only for the second baggie.

The State argues the precise moment the officer could arrest Fairchild was when dispatch initially reported Fairchild's warrant, even though dispatch told the officer that it had not yet confirmed the warrant. As such, the State argues the attenuation doctrine applies to the

7

discovery of both baggies of methamphetamine. It contends the district court's finding to the contrary amounts to clear error.

A review of the district court's finding shows that it was supported by substantial evidence. The officer testified that dispatch notified him that Fairchild "had a warrant. They had to confirm it, which requires them to go to the warrant section in dispatch, get out the actual paperwork, and look at the warrant to verify that the warrant is still valid and not just in their database." The officer further testified that as soon as dispatch inputs a suspect's information,

> it comes up on [the officer's patrol car computer screen] potentially they have a warrant if it's through Canyon County or Caldwell. Other agencies it doesn't first show up like that, but ours it does.
> So then that's when they have to verify. So after they notify me that what we call code one, they're 1099, that's when I requested they check and advise, so check the warrant, advise me if it's valid.

The officer also indicated it is his practice to detain an individual when dispatch reports a warrant, but waits to take the individual into custody until the warrant is confirmed.

Additionally, the officer submitted an affidavit containing a statement that "the warrant had been confirmed . . . subsequent to informing Defendant he was under arrest for the warrant, and thus subsequent to the Canyon County Sheriff's Officer Dispatch confirming the existence of a warrant against Defendant, I discovered a second baggie of white crystal substance." Together, the officer's testimony and affidavit show that he was waiting to confirm both the warrant's existence and the warrant's validity, despite the variety of terms he used to describe the process. Thus, we affirm the district court's finding.

The State's argument that officers may effectuate an arrest upon report of a warrant whose existence or validity is unclear has no support. The State cites a number of cases for this argument, but none relate an instance where dispatch told an officer there was an unconfirmed warrant, much less an instance where the officer validly made an arrest before the existence of the warrant was confirmed. Rather, these cases relate scenarios where an officer proceeded upon a warrant without dispatch indicating it must still confirm the warrant's existence.

Because the State argues that the officer could initiate Fairchild's arrest immediately after dispatch's initial report of a warrant, it also argues that both baggies of methamphetamine were obtained as a search incident to arrest. A review of the record shows that this theory was not argued before the district court. Thus, it is not preserved for review. *State v. Garcia-Rodriguez*,

162 Idaho 271, 275, 396 P.3d 700, 704 (2017). Only the State's alternative theory, that the attenuation doctrine applies to suppress both baggies of methamphetamine, remains.

The moment the officer received confirmation that a valid warrant existed for Fairchild's arrest divides the attenuation analysis. Before the warrant was confirmed, the officer knew only that an arrest warrant for Fairchild *might* exist; after confirmation, the officer had a certainty that one *did* exist. Knowledge that a warrant might exist is insufficient to provide a basis for an officer to effectuate an arrest or search. Thus, the officer could not validly arrest or search Fairchild until the existence of a valid warrant was confirmed.

### 1. The initial illegality relevant to the attenuation doctrine analysis is the officer's unlawful frisk

The district court found the officer's act of searching Fairchild without confirmation of the warrant was illegal. We find it was initially illegal. Consequently, we agree with the district court that the discovery of the first baggie of methamphetamine was the product of an unlawful investigatory frisk.

A warrantless search is presumptively unreasonable unless it falls within certain special and well-delineated exceptions to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *Ferreira*, 133 Idaho at 479, 988 P.2d at 705. In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court created a stop-and-frisk exception to the United States Constitution's Fourth Amendment warrant requirement. The stop and the frisk constitute two independent actions, each requiring a distinct and separate justification. *State v. Babb*, 133 Idaho 890, 892, 994 P.2d 633, 635 (Ct. App. 2000); *State v. Fleenor*, 133 Idaho 552, 556, 989 P.2d 784, 788 (Ct. App. 1999).

The stop is justified if there is a reasonable and articulable suspicion that the individual has committed or is about to commit a crime. *Florida v. Royer*, 460 U.S. 491 (1983); *Terry*, 392 U.S. at 30; *State v. DuValt*, 131 Idaho 550, 553, 961 P.2d 641, 644 (1998); *Ferreira*, 133 Idaho at 479, 988 P.2d at 705. However, merely because there are reasonable grounds to justify a lawful investigatory stop, such grounds do not automatically justify a frisk for weapons. *Babb*, 133 Idaho at 892, 994 P.2d at 635. An officer may frisk an individual if the officer can point to specific and articulable facts that would lead a reasonably prudent person to believe that the individual with whom the officer is dealing may be armed and presently dangerous and nothing in the initial stages of the encounter serves to dispel this belief. *Terry*, 392 U.S. at 27; *Babb*, 133 Idaho at 892, 994 P.2d at 635; *Fleenor*, 133 Idaho at 555, 989 P.2d at 787. In our analysis of a

frisk, we look to the facts known to the officer on the scene and the inferences of risk of danger reasonably drawn from the totality of those specific circumstances. *Babb*, 133 Idaho at 892, 994 P.2d at 635; *Fleenor*, 133 Idaho at 555, 989 P.2d at 787. A frisk is carefully limited to the search of an individual's outer clothing for the purpose of discovering weapons. *Terry*, 392 U.S. at 30. Officers may only remove objects that feel like weapons. *State v. Faith*, 141 Idaho 728, 730, 117 P.3d 142, 144 (Ct. App. 2005). Removing objects that do not feel like weapons transforms the frisk into a search for evidence. *Id.*

In this case, while there was reasonable suspicion to initiate the investigatory stop, the district court found no indication that Fairchild was armed or dangerous to justify the officer's frisk for weapons. The State makes no argument and presents no facts to the contrary. Thus, the officer's frisk of Fairchild was an unlawful search in violation of the Fourth Amendment. And even if the frisk itself were lawful, the officer exceeded the scope of the frisk by reaching into one of Fairchild's pockets and removing the first baggie of methamphetamine. The officer should have limited the frisk to a pat-down of Fairchild's outer clothing during which he could have determined that the baggie did not feel like a weapon and therefore, could not be removed from Fairchild's pocket. Because he removed the baggy from Fairchild's pocket, the frisk was transformed into an unlawful search for evidence. As this search was not justified by an exception to the warrant requirement, the first baggie of methamphetamine must be suppressed pursuant to the exclusionary rule. As explained below, the attenuation doctrine does not apply to alter this conclusion.

### 2. The attenuation doctrine applies only to the second baggie of methamphetamine

Under the federal constitution, applying the exclusionary rule and suppressing evidence is done for two purposes: (1) to deter lawless conduct by law enforcement, and (2) to close the doors of the courts to any use of evidence unconstitutionally obtained. *Wong Sun v. United States*, 371 U.S. 471, 486 (1963). The attenuation doctrine analyzes situations where there is some Fourth Amendment violation and the court must determine whether the resulting evidence was obtained by exploitation of that illegality or instead, by means sufficiently attenuated from that illegality such that the taint of the illegality is purged. *See Brown v. Illinois*, 422 U.S. 590 (1975). Thus, the attenuation doctrine permits the use of evidence that would normally be suppressed as fruit of police misconduct if the causal chain between the misconduct and the discovery of the evidence has been sufficiently attenuated. *Nardone v. United States*, 308 U.S.

338, 341 (1939); *State v. Hoak*, 107 Idaho 742, 749, 692 P.2d 1174, 1181 (1984). In applying the attenuation doctrine, the test is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488. The Idaho Supreme Court has employed the three-factor test from *Brown* to determine attenuation: (1) the elapsed time between the misconduct and the acquisition of the evidence; (2) the occurrence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct.[2] *State v. Page*, 140 Idaho 841, 846, 103 P.3d 454, 459 (2004).

In *Page*, an officer observed Page walking down a residential street at 2:00 a.m. carrying some bags. *Id.* at 842, 103 P.3d at 455. The officer approached Page and asked if he could talk to him; Page agreed. After inquiring about Page's well-being, the officer asked for Page's identification and then retained the identification while he went back to his patrol vehicle and discovered an active arrest warrant for Page. The officer arrested Page and searched him incident to arrest, discovering methamphetamine. Page was charged with possession of a controlled substance and filed a motion to suppress, which was granted by the district court. *Id.*

On appeal, the Court held the initial encounter was consensual and was accomplished pursuant to the officer's community caretaker function. *Id*. at 844, 103 P.3d at 457. However, the Court also held the totality of the circumstances demonstrated no compelling need for the officer to seize the identification and conduct a warrant check, nor were there facts present that legitimized the detention of Page once the officer determined, pursuant to his community caretaker function, that Page was not in need of assistance. Further, there was no particularized or objective justification for detaining Page. *Id*. at 845, 103 P.3d 458. Nonetheless, after utilizing the *Brown* factors to determine whether the illegal conduct was sufficiently attenuated from the discovery of the resulting evidence, the Court found the evidence admissible because the existence of a valid warrant sufficiently attenuated the initial misconduct from the subsequent discovery of the evidence. *Page*, 140 Idaho at 847-48, 103 P.3d at 459-60. In examining the flagrant and purposeful factor, the Court cited *Brown* and noted the *Brown* Court did not condone the officer's conduct in the case but ruled that it was not so shocking as to tilt the scales against attenuation. *Page*, 140 Idaho at 846, 204 P.3d at 459. Given that standard, the *Page*

---

[2] *Brown* indicated that the test is a totality of the circumstances test, yet focused on these three factors. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

Court noted the officer's conduct was not flagrant nor was his purpose improper and reversed the grant of the motion to suppress. *Id*. at 846-47, 103 P.3d at 459-60.

In *Utah v. Strieff*, ___ U.S. ___, 136 S. Ct. 2056 (2016), the United States Supreme Court addressed the same issue presented in *Page*. There, after receiving an anonymous tip, the officer surveilled a house for suspected drug activity. *Id*. at ___, 136 S. Ct. at 2059. The officer surveilled the house for about a week and noticed visitors who stayed only a short period of time, which raised his suspicion that drugs were being dealt from the house. *Id*. One day the officer watched Strieff leave the house. *Id*. at ___, 136 S. Ct. at 2060. The officer detained Strieff and requested Strieff produce his identification card, which Strieff produced. The officer retained the identification while conveying the information to dispatch. Dispatch confirmed there was an outstanding arrest warrant for Strieff. The officer arrested Strieff, searched him incident to arrest, and found methamphetamine. *Id*.

The United States Supreme Court recognized there was no reasonable suspicion to detain Strieff but ultimately held a valid, pre-existing warrant sufficiently attenuated the discovery of evidence from the initial illegality. *Id*. at ___, 136 S. Ct. at 2063. The Court analyzed the three factors set forth in *Brown*. When discussing the third factor--whether the police misconduct was both flagrant and purposeful--the Court noted: "For the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Strieff*, ___ U.S. at ___, 136 S. Ct. at 2064. The Court found the officer was at most negligent in stopping Strieff and made two good faith mistakes. *Id*. at ___, 136 S. Ct. at 2063. The officer's first mistake was concluding Strieff may have been conducting a drug transaction. Second, the officer should have asked Strieff whether he would speak with him, instead of demanding that Strieff do so.

The United States Supreme Court noted the subsequent search of Strieff was a valid search incident to arrest. Additionally, the *Strieff* Court held there was no indication that the unlawful stop was part of any systemic or recurrent police misconduct and the evidence suggested that the stop was an isolated instance of negligence that occurred in connection with a bona fide investigation of a suspected drug house. As a result, the Court ultimately concluded the officer's "errors in judgment" did not rise to the level of a purposeful or flagrant violation of Strieff's Fourth Amendment rights. *Id.*

After *Strieff*, the Idaho Supreme Court considered a similar case in *State v. Cohagan*, 162 Idaho 717, 404 P.3d 659 (2017). In that case, an officer thought he saw an individual who had an outstanding arrest warrant on the corner of a street. *Id.* at 719, 404 P.3d at 661. The officer, joined by a junior officer, turned around to get a better look, but the individual had entered a grocery store. The officers entered the store and the junior officer approached the individual, examined his driver's license, and determined that he, Cohagan, was not who the senior officer suspected. Both officers then exited the store, but received a request to return to obtain surveillance video for an unrelated incident. While the junior officer was obtaining the video, the senior officer decided to confirm the identification of Cohagan because the junior officer was new to the force. The senior officer found Cohagan in the store and as he approached Cohagan, he realized Cohagan was not the individual he suspected had an outstanding warrant. Yet, the senior officer proceeded to ask Cohagan his name, examined his identification, and requested dispatch run a warrant check. Dispatch replied that Cohagan might have a warrant so the senior officer put his hand on Cohagan's shoulder and told him to walk to the front of the store to wait for the warrant to be confirmed. Once dispatch confirmed Cohagan's warrant, the officers arrested him. *Id.* During a search incident to his arrest, the officers discovered a device with methamphetamine residue. *Id.* at 719-20, 404 P.3d at 661-62.

The Idaho Supreme Court considered application of the attenuation doctrine upon review of Cohagan's motion to suppress the methamphetamine evidence, analyzing the three *Brown* factors. *Cohagan*, 162 Idaho at 721-24, 404 P.3d 663-66. In its analysis of the purposeful or flagrant factor, the Court concluded there was no bona fide investigation because there were no objective grounds to support the senior officer's actions, especially when the senior officer knew Cohagan was not the man he suspected had an outstanding warrant. *Id.* at 722-23, 404 P.3d at 664-65. The Court also noted there was no cause for the stop because there was no indication that Cohagan was involved in illegal activity, no need to obtain Cohagan's identification for a second time, and no need for a warrant check as a precaution for officer safety. *Id.* at 724, 404 P.3d at 666. The Court characterized the senior officer's actions as nothing more than a suspicionless fishing expedition in the hope that something would turn up. *Id.* Thus, the Court determined the purposeful or flagrant factor supported a finding of suppression. *Id.* at 726, 404 P.3d at 668.

The Fourth Amendment violation at issue in this case is the officer's unlawful investigatory frisk of Fairchild, resulting in the discovery of the first baggie of methamphetamine and prompting the officer to conduct a more complete search of Fairchild. To determine if this illegality tainted the officer's discovery of the second baggie of methamphetamine such that it is fruit of a poisonous tree, we apply the *Brown* three-factor test.

As to the first factor, recent United States Supreme Court case law makes clear that the relevant "temporal proximity" is between the police misconduct and the discovery of evidence. *Strieff*, ___ U.S. at ___, 136 S. Ct. at 2062 ("First, we look to the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search."). This is consistent with this Court's holding that we look at the time between the police misconduct and the discovery of evidence. *See, e.g.*, *State v. Liechty*, 152 Idaho 163, 170, 267 P.3d 1278, 1285 (Ct. App. 2011) ("The state concedes that the time between the seizure and the discovery of methamphetamine was short.").

Generally, this factor only favors attenuation when "substantial time" has passed between the police misconduct and the discovery of evidence. *Strieff*, ___ U.S. at ___, 136 S. Ct. at 2062; *Kaupp v. Texas*, 538 U.S. 626, 633 (2003); *State v. Reynolds*, 146 Idaho 466, 474, 197 P.3d 327, 335 (Ct. App. 2008) (abrogated on other grounds). For instance, in *Strieff*, the Court held that because "only minutes" passed between an illegal stop and the discovery of drug contraband, this factor weighed against attenuation. *Strieff*, ___ U.S. at ___, 136 S. Ct. at 2062.

The second factor of the *Brown* test concerns the presence of intervening circumstances. Discovery of an arrest warrant can break the causal chain between unlawful conduct and the discovery of evidence. *Strieff*, ___ U.S. at ___, 136 S. Ct. at 2063. "Where the discovery of an arrest warrant constitutes the intervening circumstance, 'it is an even more compelling case for the conclusion that the taint of the original illegality is dissipated.'" *United States v. Simpson*, 439 F.3d 490, 495 (8th Cir. 2006) (quoting *United States v. Green*, 111 F.3d 515, 522 (7th Cir. 1997)).

The third factor regards purposeful or flagrant behavior as shown above during our discussion of *Page*, *Strieff*, and *Cohagan*.

14

###### i. The attenuation doctrine does not apply to the first baggie of methamphetamine, so it must be suppressed

An analysis of *Brown*'s second factor shows that the attenuation doctrine does not apply to the first baggie of methamphetamine because there was no intervening circumstance to attenuate the unlawful behavior from the discovery of evidence. Instead, the intervening circumstance, dispatch's report confirming the existence of a valid warrant for Fairchild's arrest, did not arise until after the first baggie of methamphetamine was discovered. Thus, the causal chain between the officer's unlawful frisk and the discovery of the first baggie of methamphetamine remained intact. Because there was no intervening cause regarding the first baggie of methamphetamine, we need not proceed to apply *Brown*'s first or third factors. We conclude the attenuation doctrine does not apply to the search resulting in discovery of the first baggie of methamphetamine, therefore, it must be suppressed under the exclusionary rule.

###### ii. The attenuation doctrine applies to the second baggie of methamphetamine

Concerning the second baggie of methamphetamine, the first *Brown* factor weighs in favor of suppression. A substantial amount of time did not pass between the officer's unlawful investigatory frisk and the officer's discovery of the second baggie of methamphetamine. In fact, the trial court found there was virtually no separation in time because the discovery of the second baggie flowed directly from the discovery of the first. As soon as the officer discovered the first baggie, Fairchild was handcuffed and read his *Miranda* rights; the officer retrieved gloves from his patrol car, continued searching Fairchild, and then discovered the second baggie. Only minutes passed during this uninterrupted process. For this reason, the temporal proximity factor weighs in favor of suppressing the second baggie of methamphetamine.

The second *Brown* factor weighs in favor of attenuation. Fairchild's arrest warrant, while not confirmed until after the officer conducted an unlawful frisk, constitutes an intervening circumstance that severed the causal chain extending from the unlawful frisk to the discovery of the second baggie of methamphetamine. The existence of Fairchild's warrant was confirmed, it predated the officer's frisk of Fairchild, and it was entirely unconnected with the frisk. *Strieff*, ___ U.S. at ___, 136 S. Ct. at 2062-63 ("Officer Fackrell's arrest of Strieff thus was a ministerial act that was independently compelled by the pre-existing warrant."). After dispatch confirmed the warrant, the officer was independently obliged to conduct a search of Fairchild. *Id.* Thus, this factor weighs heavily in favor of attenuation.

The purposeful or flagrant factor of the *Brown* test is dispositive for the second baggie of methamphetamine. The district court found the main officer's conduct was flagrant because of "multiple procedural missteps," which appear to include the officer's judgment of reasonable suspicion, the investigatory stop, and judgment of when he could act upon dispatch's report of an unconfirmed warrant. However, this finding aligns with the faulty reasoning *Strieff* argued in his case; it conflates the standard for a frisk with the standard for flagrancy. *Strieff*, ___ U.S. at ___, 136 S. Ct. at 2064 ("Strieff argues, moreover, that Officer Fackrell's conduct was flagrant because he detained Strieff without the necessary level of cause (here, reasonable suspicion)."). More severe misconduct is required than the absence of the officer's cause for an investigatory frisk. *Id.*

More severe misconduct is not present here. In fact, the district court found the officers in this case did not have any ill will or improper motives and there is no evidence that they were acting pursuant to systemic or recurrent police misconduct. Rather, the evidence suggests the officer's errors occurred in connection with a bona fide investigation of a suspected drug transaction. Indeed, the officer proceeded on a reliable informant's report and his own observations which indicated to him the need to confirm or dispel criminal behavior. The officer acted upon objective grounds which formed the basis of reasonable suspicion. This was not a random, suspicionless fishing expedition conducted in the hope that something would turn up. The officer's conduct does not rise to the level of flagrancy. Therefore, this factor weighs in favor of attenuation.

When considered together, the *Brown* factors weigh in favor of attenuation for the second baggie of methamphetamine. The temporal proximity of the unlawful investigatory frisk to the discovery of the second baggie of methamphetamine is not so significant to predominate over the warrant's function as an intervening cause or the officer's non-flagrant conduct. Therefore, we conclude the evidence of the second baggie of methamphetamine to be sufficiently attenuated from the unlawful frisk and, thus, it should not be suppressed. We reverse the district court's order granting Fairchild's motion to suppress as to the second baggie of methamphetamine.

## IV.

## CONCLUSION

The officer did have reasonable suspicion to stop Fairchild's vehicle, but lacked justification to conduct a frisk for weapons or remove the first baggie of methamphetamine from

Fairchild's pocket.  We affirm the district court's order granting Fairchild's motion to suppress as to the first baggie of methamphetamine.  The second baggie of methamphetamine, obtained subsequent to dispatch's report confirming the existence of a valid warrant for Fairchild's arrest, was sufficiently attenuated from the unlawful frisk.  We reverse the district court's order granting the motion to suppress the second baggie of methamphetamine.

Judge GUTIERREZ and Judge Pro Tem WALTERS, **CONCUR**.