# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49269

STATE OF IDAHO, )
      )
  Plaintiff-Respondent, )    Boise, August 2025 Term
      )
v. )    Opinion filed: March 26, 2026
      )
BENNY DEAN CAMPBELL, )    Melanie Gagnepain, Clerk
      )
  Defendant-Appellant. )    **SUBSTITUTE OPINION. THE COURT'S PRIOR OPINION DATED JUNE 27, 2024, IS HEREBY WITHDRAWN.**
      )
      )
      )
      )
      )

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Darla Williamson, Senior District Judge, and Derrik O'Neill, District Judge.

The order of the district court is <u>affirmed</u>.

Erik R. Lehtinen, State Appellate Public Defender, Boise, for Appellant. Ben P. McGreevy argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Kale D. Gans argued.

Federal Defender Services of Idaho and Attorneys of Idaho, Boise, and Law Offices of B.C. McComas, LLP, San Francisco, California, for Amicus Idaho Association of Criminal Defense Lawyers.

---

MOELLER, Justice.

This case addresses the scope of the search and seizure protections contained in the Fourth Amendment to the United States Constitution. While conducting an investigative detention concerning a stolen motorcycle, an Idaho State Police trooper seized defendant Benny Dean Campbell and placed him in handcuffs. Upon learning from dispatch that Campbell was on felony probation, the trooper contacted the Idaho Department of Correction ("IDOC") to confirm Campbell's status. IDOC advised the trooper that Campbell had signed a Fourth Amendment

waiver and authorized the trooper to search Campbell's backpack. The Idaho State Police later discovered heroin and methamphetamine in Campbell's backpack. Campbell was charged with two felony counts for drug trafficking and possession of a controlled substance, and two misdemeanor counts for possession of a controlled substance and possession of drug paraphernalia.

Campbell filed a motion to suppress the evidence, arguing that by initially placing him in handcuffs without justification, the trooper converted his detention into an unlawful seizure under the Fourth Amendment. The district court[1] agreed, concluding that Campbell's detention was illegal because it was a de facto arrest; however, the court also determined that the evidence discovered during the subsequent search was still admissible based on the attenuation doctrine, which is a limited exception to the warrant requirement. After the court denied his motion, Campbell entered into a conditional plea agreement with the State that allowed him to plead guilty while preserving his right to appeal the denied motion.

In his initial appeal, Campbell asked this Court to reject the federal attenuation doctrine because Article I, section 17 of the Idaho Constitution affords him greater protections than the federal standard and is incompatible with Idaho's more expansive exclusionary rule. *See State v. Campbell*, No. 49269, 2024 WL 3189134 (Idaho June 27, 2024), *reh'g granted* (Sept. 25, 2024). After this Court affirmed the district court on a different theory, holding that the evidence was admissible under the inevitable discovery doctrine, Campbell petitioned for rehearing, which we granted.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

At approximately 6:00 a.m. on November 6, 2020, Trooper Andrew D. Weinstein of the Idaho State Police ("the trooper") was driving through what he described as a "high-crime area" in Boise, Idaho. He saw two individuals—a male and female—standing near two motorcycles in the parking lot of a hotel. Neither motorcycle had a license plate. Both individuals wore backpacks and they carried motorcycle helmets. They soon walked away towards a nearby gas station. The trooper drove back by the motorcycles and visually confirmed that both were missing license plates and observed that one of the motorcycles had been spray painted blue. The trooper found this suspicious "given the otherwise nice condition of the motorcycle." After running the visible VIN

---

[1] The decision to deny the motion to suppress was entered by Judge Darla Williamson, Senior District Judge. Later in the case, District Judge Derrick J. O'Neill was appointed to preside over Campbell's subsequent proceedings and signed the judgment of conviction.

on the spray-painted motorcycle through dispatch, the trooper learned that it was a stolen vehicle from Nampa, Idaho, and was originally painted green.

The trooper drove to the gas station where he located the two individuals he saw earlier. At this time, backup was on the way. The male and female were standing near the front counter of the station's convenience store with their backpacks and motorcycle helmets. The trooper walked into the store and immediately told both individuals to get down on the ground. His gun remained holstered. The individuals complied, moving to the ground and lying on their stomachs. The woman asked what was going on. The trooper informed them that one of the motorcycles they were standing next to earlier was stolen. The woman claimed it was hers, having obtained it from a storage unit she purchased. The man stated it was not his.

The trooper had the woman stand up and remove her backpack. He then placed her in handcuffs. The trooper then had the man remove his backpack before placing him in handcuffs. As the trooper escorted both individuals out of the store, backup from the Boise Police Department arrived on scene. At his patrol car, the trooper patted down the female. He found a loaded handgun magazine in her pocket. The female told the trooper that her handgun was in her backpack. He retrieved their items from the convenience store. He also patted down the male for contraband and nothing was found. The trooper then placed them both in his patrol car.

The male identified himself as Benny Dean Campbell while the woman identified herself as Kaycee Noel Suitter. Another Idaho State Police trooper arrived on scene and ran the second motorcycle's VIN. It came back clear. On running Campbell and Suitter's names through dispatch, the trooper learned that Campbell was on probation. At this point, ten minutes had elapsed since the trooper's first contact with Campbell in the convenience store.

Campbell began to dry heave while Suitter told the trooper that she obtained the motorcycle from a storage unit she purchased. She explained that she had never checked the VIN but had spray painted the bike blue because she disliked its former color. The trooper asked Campbell if he was on probation, and Campbell confirmed that he was. Campbell continued dry heaving, so the trooper removed him from the patrol vehicle and allowed him to sit on the curb. While Boise Police watched Campbell at the curb, the trooper searched Suitter's backpack and found a handgun. Boise Police then informed the trooper that Campbell was claiming to be a confidential informant for Bonner County.

The trooper called IDOC to inform it of the situation and confirm Campbell's status. After talking to a probation officer, the trooper learned that Campbell had signed a Fourth Amendment waiver, meaning that he had previously consented to warrantless searches as a condition of probation. The probation officer said she would need to contact Campbell's supervising officer to confirm whether he was an informant for Bonner County, as he claimed. However, on learning that Suitter had a handgun, the probation officer authorized the trooper to search Campbell's backpack, where he found a black bag containing 112.7 grams of methamphetamine, 15.9 grams of heroin, a blue silicone pipe with brown residue, a scale, fentanyl, and syringes. Campbell was charged with two felonies for trafficking in heroin and methamphetamine, as well as two misdemeanor charges for possession of a controlled substance and possession of drug paraphernalia.

Campbell filed a motion to suppress the evidence obtained from the search of his backpack, asserting that his "Fourth Amendment and Article I, § 17 rights were violated when the police stopped him without reasonable, articulable suspicion, effectuated a de facto arrest, and continued to hold him against his will." At the suppression hearing, the trooper testified and explained that he is POST-certified and had been working as a trooper for the Idaho State Police for four years. The trooper stated that the area he was in on November 6, 2020, was a high-crime area he frequently patrolled. He also testified that his observations on the night in question were detailed in his report and explained that felony stops carry a "higher risk" to officer safety. After establishing the events of Campbell's detention, and hearing arguments from the parties on whether there was a de facto arrest, the district court raised questions on whether an exception to the exclusionary rule could still permit the evidence to be admitted even if there was an unreasonable seizure. Following the hearing, the district court requested additional briefing on the attenuation doctrine.

After reviewing the briefing, the district court issued a written decision denying Campbell's motion to suppress the evidence. The court concluded that, although "[the trooper] was authorized to conduct an investigative detention of [Campbell] and his female companion, to determine their involvement in the theft of the motorcycle," he lacked probable cause to make a de facto arrest by putting Campbell in handcuffs. The district court explained: "the [S]tate presented no evidence during the suppression hearing that the trooper's safety was threatened in any way by [Campbell] or his female companion and there was nothing known about the theft of the motorcycle that would

4

cause it to be considered a violent crime." Additionally, because the trooper did not know Campbell was on probation at the time he was placed in handcuffs, the court determined that Campbell's Fourth Amendment waiver did not authorize an arrest where there were no obvious officer safety or flight issues at risk. On this point, the district court added a footnote to its decision, stating: "The inevitable discovery doctrine also does not assist the State here since there is no indication that there was a parallel path by which the drug evidence would have been discovered, apart from [the trooper]'s encounter with [Campbell]."

While acknowledging that these factors "favor[ed] suppression," the district court determined that the evidence was still admissible under the attenuation doctrine, which permits evidence where the "connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Utah v. Strieff*, 579 U.S. 232, 238 (2016). The court determined that, while there was temporal proximity between the purported de facto arrest and discovery of the evidence, there was the intervening circumstance of discovering Campbell's probation status and getting authorization to search the backpack from the probation officer. The purpose of the trooper's actions also weighed in favor of attenuation because there was no showing "of flagrant or purposeful or systemic misconduct." (Emphasis omitted.) "Balancing the relative weights of the factors together," the court concluded that the trooper "did not exploit an illegality to discover evidence." Thus, the court ruled that the evidence should not be suppressed. Although Campbell argued that the federal attenuation doctrine does not apply in Idaho because of the greater protections of the Idaho Constitution, the district court determined that the defense "cited no published Idaho appellate case specifically holding this and *State v. Fenton*[, 163 Idaho 318, 413 P.3d 419 (Ct. App. 2017),] makes no mention of this right under the Idaho Constitution."

Campbell entered into a conditional plea agreement with the State whereby he would plead guilty to trafficking in heroin while preserving his right to appeal the denied suppression motion. In exchange for his plea, the State dismissed his remaining charges. The district court sentenced Campbell to a unified prison sentence of seventeen years with the first ten years fixed (the mandatory minimum fixed term set forth in Idaho code section 32-2732B(a)(6)). Campbell timely appealed his judgment of conviction and order of commitment.

On June 27, 2024, in a three to two decision, this Court affirmed the district court's decision, holding that, while there was a de facto arrest, suppression was not necessary because

5

the evidence was admissible pursuant to the inevitable discovery exception to the Fourth Amendment. *Campbell*, 2024 WL 3189134. Campbell timely filed a petition for rehearing, which the Court granted. The Court ordered additional briefing and granted leave to the Idaho Association of Criminal Defense Lawyers to appear as amicus curiae and submit a brief. Both Campbell and the amicus urge this Court to reexamine the manner in which it applied the inevitable discovery doctrine, suggesting that it was incompatible with current Fourth Amendment jurisprudence.

## II. STANDARDS OF REVIEW

When reviewing the denial of a defendant's motion to suppress, this Court applies a bifurcated standard of review. *State v. Marsh*, 171 Idaho 627, 630, 524 P.3d 906, 909 (2023); *State v. Bishop*, 146 Idaho 804, 810, 203 P.3d 1203, 1209 (2009). "This Court accepts the trial court's findings of fact unless they are clearly erroneous but freely reviews the trial court's application of constitutional principles to the facts found." *Marsh*, 171 Idaho at 630, 524 P.3d at 909 (citation modified). Findings of fact that are supported by substantial and competent evidence are not clearly erroneous. *Id.* at 630–31, 524 P.3d at 909–10.

## III. ANALYSIS

Campbell's primary argument on appeal originally asked this Court to reject the federal attenuation doctrine, which the district court applied in ruling that the evidence obtained during the search was admissible, as incompatible with the multiple purposes of Idaho's exclusionary rule. In response, the State contended that (1) the trooper had reasonable articulable suspicion to detain Campbell in handcuffs and, even if he did not, (2) denying the suppression motion was proper where the evidence would have been inevitably discovered. Campbell then responded by asserting that (1) the trial court properly determined that this was an illegal de facto arrest and (2) inevitable discovery was not preserved for appeal because it was never raised below. In our initial opinion on appeal, this Court agreed that an improper de facto arrest had occurred. However, citing the right result-wrong theory principle, a three to two majority of the Court held that the district court properly denied Campbell's motion to suppress because the evidence Campbell wished to suppress would have been inevitably discovered.

On rehearing, the parties have understandably repostured their arguments somewhat. Campbell now maintains that (1) the inevitable discovery doctrine was not preserved for appeal and, even if it were preserved, (2) the Court improperly applied the inevitable discovery doctrine to the facts because it requires a separate, lawful investigation to be underway. The State asserts

6

that the evidence in the record is sufficient to demonstrate a parallel path by which the evidence would have been inevitably discovered.

After carefully reconsidering the matter, we arrive at the same legal conclusion as we did before and affirm the district court's denial of Campbell's motion to suppress. However, in doing so, this substitute opinion delves deeper into the inevitable discovery doctrine to clarify some misconceptions that may have crept into our jurisprudence—particularly concerning the alleged necessity of a separate, independent investigation. But first, we must address the circumstances of this case that gave rise to our application of the inevitable discovery exception to the Fourth Amendment warrant requirement—the initial detention.

## A. The district court properly concluded that the State failed to establish that placing handcuffs on Campbell was a reasonable precaution for the trooper's safety.

Campbell argues that the district court properly concluded that the trooper effectuated an illegal de facto arrest when he placed Campbell and his companion in handcuffs, arguing that the trooper "employed a degree of force which exceeded that justified for an investigatory detention, without any threats to officer safety, alleged violence, or noncompliance on the part of Mr. Campbell." The State disagrees, noting "[i]t is uncontested that [the trooper] had reasonable articulable suspicion to detain Campbell while he investigated the motorcycle theft." The State contends that, under the totality of the circumstances, "briefly handcuffing Campbell did not transform that detention into a de facto arrest." For the reasons explained below, we conclude that the district court correctly determined that the State failed to present any evidence during the suppression hearing that would support a finding that the trooper's safety was threatened or that the trooper was concerned for his safety.

The Fourth Amendment to the United States Constitution and Article I, section 17 of the Idaho Constitution both provide that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV; Idaho Const. art. I, § 17. "A seizure for Fourth Amendment purposes may take the form of an arrest or an investigatory detention." *State v. Maahs*, 171 Idaho 738, 745, 525 P.3d 1131, 1138 (2023). "For an arrest to be considered lawful, it must be based on probable cause." *State v. Bishop*, 146 Idaho 804, 816, 203 P.3d 1203, 1215 (2009) (citation omitted). Investigatory detentions, however, "are permissible when justified by an officer's reasonable articulable suspicion that a person has committed, or is about to commit, a crime." *State v. Huntley*, 170 Idaho 521, 526, 513 P.3d 1141, 1146 (2022) (quoting *Bishop*, 146 Idaho at 811, 203 P.3d at 1210).

7

"When determining whether an arrest or an investigative detention has occurred," a court considers "the context of the crime, the stop, and the precautions necessary to an officer's safety." *Reagan v. Idaho Transp. Dep't*, 169 Idaho 689, 697, 502 P.3d 1027, 1035 (2021). This is an objective standard informed by the totality of circumstances in each particular case. *United States v. Cortez*, 449 U.S. 411, 417 (1981) ("[T]he whole picture—must be taken into account."); *State v. Pannell*, 127 Idaho 420, 423, 901 P.2d 1321, 1324 (1995). Important factors to consider include: "the seriousness of the crime, the location of the encounter, the length of the detention, the reasonableness of the officer's display of force, and the conduct of the suspect as the encounter unfolds." *Reagan*, 169 Idaho at 697, 502 P.3d at 1035 (quoting *State v. Ferreira*, 133 Idaho 474, 480, 988 P.2d 700, 706 (Ct. App. 1999)). Specificity is key in justifying an intrusive Fourth Amendment seizure: a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "This demand for specificity in the information upon which police action is predicated is the central teaching of [the United States Supreme] Court's Fourth Amendment jurisprudence." *Id.* at 21 n.18 (citations omitted).

The need for specificity applies with equal force when evaluating whether the use of handcuffs converts an investigatory detention into an illegal arrest. Although this Court has held that "officers are entitled to use handcuffs in limited investigatory stops to maintain their safety," *State v. DuValt*, 131 Idaho 550, 554, 961 P.2d 641, 645 (1998), the State must overcome a "high threshold" to justify that level of intrusion. *Pannell*, 127 Idaho at 424, 901 P.2d at 1325. Thus, "in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicions or 'hunch,' but to specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *DuValt*, 131 Idaho at 554, 961 P.2d at 645 (quoting *State v. Johns*, 112 Idaho 873, 877–78, 736 P.2d 1327, 1331–32 (1987)).

This Court recently considered an officer's use of handcuffs in *Reagan*, and determined that, based upon the totality of the circumstances, an investigative detention was converted into an illegal de facto arrest. 169 Idaho at 697, 502 P.3d at 1035. In *Reagan*, a concerned citizen called police to report a possible intoxicated driver. *Id.* at 692, 502 P.3d at 1030. Dispatch learned that the vehicle was registered to Reagan and a police officer was dispatched to her residence. *Id.* The officer met Reagan at the door to her home. *Id.* at 692, 698, 502 P.3d at 1030, 1036. Reagan agreed to participate in field sobriety tests, and she failed all of them. *Id.* at 692, 502 P.3d at 1030. "The

officer then escorted Reagan to the patrol car, handcuffed her, and placed her in the backseat, telling her that she was under arrest for DUI." *Id.* After completing an administrative license suspension advisory, and waiting the requisite fifteen minutes, the officer administered a breathalyzer test, which showed Reagan's blood alcohol content to be 0.188/0.198. *Id.* at 692–93, 502 P.3d at 1030–31. "The officer again informed Reagan she was being arrested for driving under the influence, and transported her to the Bonner County Detention Facility." *Id.* at 693, 502 P.3d at 1031.

This Court concluded that the officer's use of handcuffs in *Reagan* "exceeded the bounds of what was reasonably intrusive in conducting an investigative detention" and "converted the investigative detention into an arrest." *Id.* at 697, 502 P.3d at 1035. We explained that "the threshold for showing that handcuffs were a reasonable precaution for officer safety is high." *Id.* For Reagan, the use of handcuffs was unwarranted because nothing indicated Reagan posed a threat to officer safety and "the officer made no attempt to articulate that such a threat even existed." *Id.* The alleged crime did not involve violence, there was no resistance, there were no known weapons, and Reagan did not threaten the officer. *Id.* at 697–98, 502 P.3d at 1035–36. This Court concluded that all these factors taken together made the act of handcuffing Reagan an excessive intrusion that converted the investigative detention into an arrest. *Id.* Also important to this Court's analysis was that the officer was investigating a misdemeanor offense, and he never observed Reagan commit "*any* violation of the law"; yet he informed Reagan twice that she was "under arrest" before administering the breathalyzer test. *Id.* at 698, 502 P.3d at 1036. Importantly, as occurred in *State v. Clarke*, 165 Idaho 393, 446 P.3d 451 (2019), we again recognized that the Idaho Constitution did not permit a warrantless arrest for a misdemeanor that the officer did not witness. *Reagan*, 169 Idaho at 698, 502 P.3d at 1036.

In contrast, in *Johns*, we upheld the use of handcuffs, because it "was a reasonable precaution for the officer's safety." 112 Idaho at 878, 736 P.2d at 1332. Johns was a suspected murderer who, it was believed, had killed the victim with a knife. *Id.* at 875–76, 736 P.2d at 1329–30. The officer stopped Johns after seeing him drive away from the victim's apartment. *Id.* at 876, 736 P.2d at 1330. The officer was alone when he confronted Johns and "concerned for his own safety," knowing that Johns was an armed suspect in a knife killing. *Id.* at 876–77, 736 P.2d at 1330–31. The officer reported that Johns appeared nervous too, and the officer had already seen Johns remove a knife from his vehicle. *Id.* The officer found a second knife when he frisked Johns,

and Johns resisted when the officer attempted to remove this weapon. *Id.* These factors, coupled with the officer's testimony, led this Court to conclude that the use of handcuffs was a reasonable safety precaution and did not convert the investigative stop into a de facto arrest. *Id.* at 878, 736 P.2d at 1332.

Here, we agree with the district court's conclusion that the trooper's explanation for Campbell's detention falls short of the "high threshold" required to justify the use of handcuffs during Campbell's initial detention. This case undoubtedly has some of the same circumstances present in both *Reagan* and *Johns*, including a solo officer acting during dark hours. Yet this case is more comparable to *Reagan*, where a compliant suspect was placed in handcuffs with no evidence cited by the officer as to his safety. Critically, the district court found that the trooper never testified to any specific safety concerns when he encountered Campbell and Suitter at the convenience store, nor did the trooper testify that he handcuffed them for that reason. The closest the trooper came to explaining why he handcuffed Campbell was on redirect examination when he was asked by the prosecutor to explain a "felony stop":

Q. Can you explain what a felony stop is for a stolen bike?

[Objection made and overruled.]

. . . .

A. A typical felony stop involves multiple officers with firearms, pistols and/or rifles drawn pointed at the individuals, instructing them to get on their knees or walk backwards, and then placing them in cuffs and securing them into a vehicle.

Q. Why?

A. It's our training due to safety reasons as it's usually a higher risk crime.

Even with this limited testimony, it is unclear whether handcuffing Campbell and his companion was a result of training[2] or a specific concern for safety. The trooper also did not testify whether he considered this investigative detention to involve "a higher risk crime," or explain why handcuffs were needed here when other felony stop procedures were not. While the trooper may

---

[2] We have previously expressed concern with the State attempting to justify unconstitutional police conduct on the mere basis that it was consistent with a department's standard operating procedure or training. *See State v. Saldivar*, 165 Idaho 388, 391–92, 446 P.3d 446, 449–50 (2019) ("[T]he district court's decision appears, at least in part, to be based on its concerns with the officer's testimony that 'it is standard operating procedure . . . to frisk anyone in handcuffs.' The district court was justifiably troubled over the constitutional implications of officers replacing the requisite 'armed and dangerous' analysis with a 'standard operating procedure' of frisking everyone they detain. We have similar concerns with such a notion but conclude that, under an objective analysis, the officers in this case had reasonable, articulable suspicion that Saldivar was armed and dangerous based on the facts of this case." (alteration in original)).

have had legitimate safety concerns, the State's failure to present evidence of *any* specific concerns for officer safety during the evidentiary hearing has left it for the courts to guess why this trooper chose to handcuff Campbell. While the State invites us to shore up the trooper's testimony on appeal by citing the surrounding circumstances, this is ultimately an invitation to substitute our own interpretation of the facts for the trooper's actual testimony. To be sure, the trooper was outnumbered, present in what he described as a high crime area, and he may have had other safety concerns as he investigated the stolen motorcycle, but it is the State's burden to elicit such testimony from the officer at the suppression hearing, rather than relying on an appellate court to search the record for an after-the-fact justification of an officer's actions.

Accordingly, we conclude that the State failed to establish that the use of handcuffs on Campbell was a reasonable precaution for the trooper's safety. Campbell's stop became a de facto arrest when the suspects were ordered to lie down and were handcuffed. Thus, we affirm this part of the district court's analysis.

**B. The district court erred in applying the attenuation doctrine because of the close temporal proximity and the lack of a meaningful intervening circumstance.**

Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.' " *Utah v. Strieff*, 579 U.S. 232, 238 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)). Thus, we must determine whether the discovery of Campbell's probation status sufficiently "breaks the causal chain between the unlawful stop and the discovery of the evidence." *State v. Cohagan*, 162 Idaho 717, 721, 404 P.3d 659, 663 (2017).

Under the federal attenuation doctrine, courts consider three factors when determining whether unlawful conduct was adequately attenuated: "(1) the elapsed time between the misconduct and the acquisition of the evidence, (2) the occurrence of intervening circumstances, and (3) the flagrancy and purpose of the improper law enforcement action." *Id.* at 721–22, 404 P.3d at 663–64 (first quoting *State v. Page*, 140 Idaho 841, 846, 103 P.3d 454, 459 (2004); then citing *Brown v. Illinois*, 422 U.S. 590, 603 – 04 (1975); and then citing *Strieff*, 579 U.S. at 239). Here, the district court found that the discovery of Campbell's probationary status and his probation officer's order to search were significant intervening circumstances that weighed in favor of attenuation and against suppression.

Campbell argues that the federal attenuation doctrine is inapplicable in Idaho because the purpose and flagrancy factors are incompatible with the purposes of Idaho's multiple purpose exclusionary rule.[3] He asserts that under a heightened attenuation doctrine, the exception does not apply here. Further, Campbell requests that this Court adopt the test used by the Washington Supreme Court. *See State v. Mayfield*, 434 P.3d 58 (Wash. 2019). However, we need not determine whether the federal attenuation doctrine is compatible with Idaho's exclusionary rule because even under the federal standard, the attenuation doctrine is inapplicable to the facts of this case. Moreover, principles of constitutional avoidance require us to refrain from answering constitutional questions that are unnecessary for the resolution of the issue. *State ex rel. Kempthorne v. Blaine County*, 139 Idaho 348, 350, 79 P.3d 707, 709 (2003) ("It is also well established that when a case can be decided upon a ground other than a constitutional basis, the Court will not address the constitutional issue unless it is necessary for a determination of the case." (citing *Olsen v. J.A. Freeman Co.*, 117 Idaho 706, 710, 791 P.2d 1285, 1289 (1990)).

First, applying the three prongs of the federal test for attenuation, we look to the " 'temporal proximity' between the unconstitutional conduct and the discovery of evidence." *Cohagan*, 162 Idaho at 722, 404 P.3d at 664 (alteration omitted) (quoting *Strieff*, 579 U.S. at 239). If there is substantial time between the unlawful police conduct and the discovery of the evidence, this factor favors attenuation. *Id.* (finding that the few minutes between the illegal stop and the discovery of drug contraband favored suppression). Notably, less than two hours was deemed an insufficient interval to purge the taint of unlawful activity in *Strieff*. 579 U.S. at 239–40. Here, the time elapsed between the de facto arrest and discovery of the evidence was between ten and fifteen minutes. We conclude that this factor weighs heavily in favor of suppression.

Second, there must also be an intervening circumstance that has "interrupted" the unconstitutional conduct. *Id.* at 721, 404 P.3d at 663 (quoting *Strieff*, 579 U.S. at 238). Campbell's probationary status was discovered while he remained unlawfully handcuffed and the subsequent

---

[3] While the sole purpose of the federal exclusionary rule is to deter police misconduct, Idaho's exclusionary rule has multiple purposes, including to:

> (1) provide an effective remedy to persons who have been subjected to an unreasonable government search and/or seizure; (2) deter the police from acting unlawfully in obtaining evidence; (3) encourage thoroughness in the warrant issuing process; (4) avoid having the judiciary commit an additional constitutional violation by considering evidence which has been obtained through illegal means; and (5) preserve judicial integrity.

*State v. Plata*, 171 Idaho 833, 842, 526 P.3d 1003, 1012 (2023) (citation modified).

search followed immediately after. No intervening circumstance arose that was independent of the constitutional violation, and there was no temporal break or meaningful interruption in the causal chain. *See Taylor v. Alabama*, 457 U.S. 687 (1982) (holding that the taking of fingerprints obtained as part of the arrest was not sufficiently attenuated to purge the taint). Although the officer might have later discovered Campbell's probationary status through lawful means, the discovery in this case occurred *during* the unlawful arrest itself; therefore, it did not constitute an intervening circumstance sufficient to attenuate the taint. Because the second prong cannot be met by the State, we need not consider the third prong, the flagrancy of the officer's conduct.

For the above-stated reasons we conclude the district court erred in invoking the attenuation doctrine as grounds for denying the motion to suppress because the taint of the unlawful arrest had not dissipated. Thus, we need not determine whether the Idaho Constitution contains a higher standard because the circumstances here are insufficient to meet the federal attenuation doctrine and any heightened standard would certainly fail as well. While the attenuation doctrine cannot justify admission of the evidence, we next turn to a doctrine that was considered and rejected by the district court: the inevitable discovery doctrine.

## C. While the initial seizure of Campbell was unreasonable, suppression of the evidence later obtained was not required because it would have been inevitably discovered.

The State argues that, although it never raised the issue of inevitable discovery below, application of this exception to the warrant requirement supports the district court's conclusion that suppression was not required. It argues that the issue was preserved because "the district court sua sponte ruled that inevitable discovery would not apply" in its written ruling. Campbell responds that the State's inevitable discovery arguments were not properly preserved for appeal because "the district court's statements in a footnote to its de facto arrest ruling and a comment in its attenuation analysis did not constitute an adverse ruling from which the State could appeal." Campbell further argues that, even if the issue were preserved, the inevitable discovery doctrine does not apply because there was no independent line of investigation.

Thus, there are two issues for this Court to consider: first, whether the issue of inevitable discovery was preserved for appellate review; and second, if preserved, whether the inevitable discovery doctrine is applicable to the circumstances presented here.

*1. Because the district court made an express ruling that the inevitable discovery exception did not apply to this case, the issue was preserved for appeal.*

While this Court has explained that it is not bound by erroneous legal rulings, *Hooley v. State*, 172 Idaho 906, 914, 537 P.3d 1267, 1275 (2023), proper preservation of a legal theory is required for this Court to affirm based on the right result-wrong theory rule. *State v. Hoskins*, 165 Idaho 217, 226, 443 P.3d 231, 240 (2019). We have explained that our preservation rule

> fosters the full testing of issues by the adversarial process, ensures that factual records are fully developed, aids the Court in the correct resolution of cases through "the refinement of . . . arguments on appeal and the wisdom of the trial court in deciding the matter in the first instance," and serves interests of efficiency and finality.

*Carver v. Hornish*, 171 Idaho 118, 124, 518 P.3d 1175, 1181 (2022) (quoting *State v. Howard*, 169 Idaho 379, 385, 496 P.3d 865, 871 (2021)).

We have consistently held that we will not consider issues raised for the first time on appeal "unless the record discloses an adverse ruling which forms the basis for the assignment of error." *State v. Yakovac*, 145 Idaho 437, 442, 180 P.3d 476, 481 (2008) (quoting *Mallonee v. State*, 139 Idaho 615, 622–23, 84 P.3d 551, 558–59 (2004)). More recently, we clarified "that a party preserves an issue for appeal by properly presenting the issue with argument and authority to the trial court below and noticing it for hearing *or* a party preserves an issue for appeal if the trial court issues an adverse ruling." *State v. Miramontes*, 170 Idaho 920, 924–25, 517 P.3d 849, 853–54 (2022). "Both are not required." *Id.*

Here, at the district court's request, the parties briefed the attenuation doctrine. Following the hearing on the motion to suppress, the district court questioned the parties on whether any exceptions to the exclusionary rule would apply if the court found there was a de facto arrest. Then, in its written decision, the district court made two statements that touched on the doctrine of inevitable discovery. First, the court noted in a footnote that "the inevitable discovery doctrine also does not assist the State here . . . ." This was based on the court's interpretation of *State v. Maxim*, 165 Idaho 901, 454 P.3d 543 (2019), and *State v. Downing*, 163 Idaho 26, 407 P.3d 1285 (2017), which led it to reject inevitable discovery because "there is no indication that there was a parallel path by which the drug evidence would have been discovered, apart from [the trooper's] encounter with [Campbell]." Yet later, while discussing the State's attenuation theory, the court made an apparently inconsistent finding: "If [the trooper] had just detained [Campbell], without handcuffing him, he would have discovered that he was on probation and had signed a Fourth

Amendment waiver, as soon as he conducted the relevant inquiries." For reasons explained below, although the second statement was made as part of the court's separate analysis of the attenuation doctrine, it supports application of the inevitable discovery exception to the facts of this case.

The district court's footnoted ruling did not include a lengthy analysis regarding the inevitable discovery doctrine; however, it did make a definitive ruling on the issue, concluding that the inevitable discovery doctrine did not apply. The court went on to grant the motion to suppress on different grounds, ruling that the attenuation doctrine applied. Thus, because the State prevailed on the suppression motion, albeit under a different theory, it had no reason to appeal the inevitable discovery ruling. However, once this Court determined that the district court incorrectly applied the attenuation doctrine to the facts of this case, the district court's ruling on the inevitable discovery doctrine became the dispositive ruling in the case. That ruling was unquestionably adverse to the State. Therefore, although we acknowledge that this is not the typical way issues are preserved for appeal, we conclude that the applicability of the inevitable discovery doctrine *was decided* by the trial court in the first instance. We are mindful of Campbell's position that this was not an issue the parties asked the trial court to decide; however, we decline to treat the court's footnote as a merely gratuitous statement. Indeed, the trial court improperly elected to apply the attenuation exception only after it mistakenly concluded that inevitable discovery was inapplicable.

As noted above, an adverse ruling is one of two ways an issue may be preserved for appellate review: "a party preserves an issue for appeal if the trial court issues an adverse ruling." *Miramontes*, 170 Idaho at 925, 517 P.3d at 854. Based on the posture of the parties' arguments on appeal, the effect of the district court's ruling on inevitable discovery was adverse to the State. Accordingly, we hold that the issue of inevitable discovery is preserved for our consideration on appeal because an adverse ruling by the trial court formed the basis for the State's assignment of error on appeal.

2. *The district court erred in concluding that the doctrine of inevitable discovery was inapplicable.*

The inevitable discovery doctrine is a recognized exception to the exclusionary rule in Idaho. *Maxim*, 165 Idaho at 908, 454 P.3d at 550. It "allows for the admission of evidence that would have been discovered even without the unconstitutional source," *Utah v. Strieff*, 579 U.S. 232, 238 (2016), and applies where "the prosecution can establish by a preponderance of the

evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984).

The United States Supreme Court first recognized the inevitable discovery doctrine in *Nix*. There, detectives elicited incriminating statements from the defendant about the location of a missing girl's body in violation of his Sixth Amendment right to counsel. 467 U.S. at 436–37. The Supreme Court held that because a search party was closing in on the location of the body before being called off, the location would have been discovered without the police misconduct. *Id.* at 448. Explaining its reasoning, the Court stated, "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Id.* at 442 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

After *Nix*, the Supreme Court once again examined the inevitable discovery doctrine in *Murray v. United States*, 487 U.S. 533 (1988). There, the Supreme Court clarified the reasoning behind the inevitable discovery doctrine: "Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Id.* at 539 (emphasis omitted). The dissent succinctly summarized the premise of the doctrine, noting that, under certain circumstances, the deterrence rationale behind the exclusionary rule does not "justify the social cost of excluding probative evidence from a criminal trial." *Id.* at 544–45 (Marshall, J., dissenting) (first citing *Nix*, 467 U.S. at 444–46; and then citing *United States v. Leon*, 468 U.S. 897, 906–09 (1984)).

a. Neither *Nix* nor *Murray* require proof that law enforcement was actively in pursuit of an independent or parallel investigation.

Although Campbell and the amicus argue that their view of the inevitable discovery exception—that an independent, parallel investigation is always required—is settled law, "[w]hether an independent line of investigation is required for the inevitable discovery exception to apply is a question that has divided the circuits." *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995). Therefore, we must examine these varying views closely.

Some circuits have interpreted *Nix* narrowly and only apply the inevitable discovery doctrine if there are other lawful investigatory paths already underway. Under this interpretation, the state must prove that it was lawfully pursuing a separate or parallel investigation, in addition

to the tainted investigation, that would have inevitably led to the evidence. *See, e.g.*, *United States v. Jackson*, 596 F.3d 236, 241 (5th Cir. 2010); *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997); *United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992); *United States v. Satterfield*, 743 F.2d 827, 846 (11th Cir. 1984), *superseded by statute*, Mandatory Victims Restitution Act of 1996, Pub. L. No. 97-291, 96 Stat. 1255, *on other grounds as stated in United States v. Edwards*, 728 F.3d 1286 (11th Cir. 2013). These circuits impose two requirements for the inevitable discovery doctrine to apply: "(1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) the Government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." *Jackson*, 596 F.3d at 241; *accord Conner*, 127 F.3d at 667; *Eng*, 971 F.2d at 859; *Satterfield*, 743 F.2d at 846. In the case at bar, this is the parallel path analysis that the trial court undertook in ruling out inevitable discovery as a basis for admission of the disputed evidence.

In contrast, many circuit courts have interpreted *Nix* more broadly and rejected the requirement of a preexisting alternative path. These circuits have held that the analysis should "focus on the questions of independence and inevitability[,] and remain flexible enough to handle the many different fact patterns which will be presented." *United States v. Silvestri*, 787 F.2d 736, 746 (1st Cir. 1986); *see also United States v. D'Andrea*, 648 F.3d 1, 12 (1st Cir. 2011) (stating that there is "no independent line of investigation" requirement in the First Circuit); *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) ("It is the government's burden to show that the evidence at issue would have been acquired through lawful means, a burden that can be met if the government establishes that the police, following routine procedures, would inevitably have uncovered the evidence."); *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008) (holding that an "attractive middle ground is to require the government, if it wants to use the doctrine of inevitable discovery to excuse its failure to have obtained a search warrant, to prove that a warrant would certainly, and not merely probably, have been issued had it been applied for"); *United States v. Larsen*, 127 F.3d 984, 987 (10th Cir. 1997) ("Neither the majority opinion in *Nix* nor our cases limit the inevitable discovery exception to lines of investigation that were already underway. They require only that the investigation that inevitably would have led to the evidence be independent of the constitutional violation.").

Most circuits, including the Ninth Circuit, appear to have followed this "middle ground" approach, holding that a separate, untainted investigation is not a per se requirement, provided the

State can prove that the evidence would have been inevitability discovered by establishing historical facts independent of the illegal search. In *Boatwright*, the Ninth Circuit disavowed a strict interpretation on *Nix*, noting that some cases demonstrate inevitability in such a compelling way "that the exclusionary rule is a mechanical and entirely unrealistic bar, preventing the trier of fact from learning what would have come to light in any case." *United States v. Boatwright*, 822 F.2d 862, 864 (9th Cir. 1987) (holding that there was insufficient evidence to show that the evidence would have been discovered by a lawful search). "In such cases, the inevitable discovery doctrine will permit introduction of the evidence, whether or not two independent investigations were in progress." *Id.* However, the facts in the record must be sufficient to justify a "comprehensive definition" of the inevitable discovery doctrine, and the "doctrine is best developed on a case by case basis." *Id.*; *see also United States v. Thomas*, 955 F.2d 207, 210–11 (4th Cir. 1992) (adopting *Boatwright*). Thus, in these circuits, there are two instances in which the inevitable discovery doctrine applies: "when the government can demonstrate *either* the existence of an independent, untainted investigation . . . *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered." *Kennedy*, 61 F.3d at 499.

We conclude that this middle ground approach, as articulated in *Boatright*, is the most faithful application of the holdings in both *Nix* and *Murray*. While the facts at issue in *Nix* involved a separate investigation already underway, the Supreme Court majority did not suggest that it is a strict requirement. *See Nix*, 467 U.S. 431. Instead, the *Nix* Court required that there be "no speculative elements" and that inevitability be supported by "historical facts capable of ready verification or impeachment . . . ." *Id.* at 444 n.5. The goal of the inevitable discovery exception is to put "police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred . . . ." *Id.* at 443 (emphasis added); *see also Murray*, 487 U.S. 533. This approach stays true to the rationale behind the *Nix* and *Murray* decisions, while recognizing that flexibility is necessary to fulfill its purpose in different circumstances.

Despite the amicus curiae's hyperbolic claims that our original opinion in this case was "against the great weight of caselaw nationwide," and that our holding will lead to "pernicious and sweeping . . . ramifications," in reality, only a minority of circuits still have the strict requirement of a separate investigation. Notably, even those circuits have begun to question the soundness of the requirement. *See United States v. Salinas*, 543 F. App'x 458, 467 (5th Cir. 2013) (the independent investigation requirement "may be superfluous"); *United States v. Baez*, 983 F.3d

1029, 1039 (8th Cir. 2020) (recognizing that its application of the requirement has been inconsistent). Furthermore, the Eleventh Circuit has relaxed the requirement. *See United States v. Watkins*, 13 F.4th 1202, 1211 (11th Cir. 2021) (" 'Active pursuit' in this sense does not 'require that police have already planned the particular search that would obtain the evidence' but only 'that the police would have discovered the evidence by virtue of ordinary investigations of evidence or leads already in their possession.' " (quoting *United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015), *overruled on other grounds by United States v. Watkins*, 10 F.4th 1179 (11th Cir. 2021))).

In addition to the federal circuit courts, it is also worth noting that many state supreme courts have also rejected a strict requirement for a separate, independent investigation. *See, e.g., State v. Topanotes*, 76 P.3d 1159, 1163–64 (Utah 2003); *Garnett v. State*, 308 A.3d 625, 649 (Del. 2023); *State v. Jackson*, 882 N.W.2d 422, 439 (Wis. 2016); *Commonwealth v. Jones*, 593 S.E.2d 204, 208 (Va. 2004); *Miller v. State*, 27 S.W.3d 427, 432 (Ark. 2000); *People v. Carpenter*, 988 P.2d 531, 546 (Cal. 1999); *State v. St. Yves*, 751 A.2d 1018, 1023 (Me. 2000); *State v. Paxton*, 925 P.2d 721, 725–26 (Ariz. Ct. App. 1996); *Oken v. State*, 612 A.2d 258, 271 (Md. 1992); *State v. Garner*, 417 S.E.2d 502, 507–08 (N.C. 1992).

For these reasons, we hold that a finding that there was a lawful separate or independent investigation underway is not a per se requirement in every case for the inevitable discovery doctrine to apply. While a separate, untainted investigation may be the simplest way to establish this exception, we conclude that there are other situations that may still make the discovery inevitable. However, as discussed below, to remove the taint of illegal activity, the government must still prove that the discovery was inevitable from situations *not revealed by the unlawful activity itself*.

      b.  <u>This standard is consistent with Idaho precedent</u>.

Although past Idaho cases addressing the inevitable discovery doctrine have typically featured a second parallel investigation, this Court has never held that a separate, independent investigation is a requirement. Today, we clarify that an alternative way to establish an inevitable discovery exception under *Nix* has always existed, we have just not previously been asked to address it.

We have previously held that "the inevitable discovery exception does not permit us to speculate on the course of action the investigation could have taken in the absence of [the

19

Constitutional violation]—even if that alternate course likely would have yielded the evidence." *State v. Maxim*, 165 Idaho 901, 909, 454 P.3d 543, 551 (2019) (alteration in original) (quoting *State v. Downing*, 163 Idaho 26, 32, 407 P.3d 1285, 1291 (2017)). "The doctrine must presuppose inevitable hypotheticals running in parallel to the illegal actions, not in series *flowing directly from the officers' unlawful conduct*." *Downing*, 163 Idaho at 32, 407 P.3d at 1291 (emphasis added). In *Maxim*, this Court explained that the ultimate question that must be asked for the inevitable discovery doctrine to apply is "whether the State can prove that the evidence in question would have been inevitably discovered even *if the police illegality is removed from the equation*." 165 Idaho at 909, 454 P.3d at 551 (emphasis added). The defendant in *Maxim* moved to suppress evidence that was discovered after police unlawfully entered his girlfriend's apartment and searched him. *Id.* at 903, 454 P.3d at 545. The district court denied his motion to suppress, finding that the evidence would have been inevitably discovered. *Id.* at 904, 454 P.3d at 546. Although the police conducted a warrantless search, the district court explained that the owner of the apartment complex would have eventually allowed the police to enter the premises, and that police still would have found and searched Maxim. *Id.* at 904, 909, 454 P.3d at 546, 551.

On appeal, this Court criticized the district court's heavy reliance on "prolonged timelines that could not have accounted for all the permutations of possible events." *Id.* at 909, 454 P.3d at 551. We used the example of branching parallel paths:

> A police investigation often takes branching paths. The inevitable-discovery doctrine presupposes parallel paths leading toward the inevitable discovery of evidence. If, because of illegal police action, one path arrives at the evidence before the other does, then *the State will be permitted to prove that the existing alternative path would have yielded the evidence even if the existing alternative path was cut short due to the discovery of the evidence*. However, the split in the investigation which creates these parallel paths must occur *prior to or independent of the illegality, not because of it*. The question is not what legal path the police would have inevitably taken which could have yielded the evidence. The question is what legal path the police actually took which would have inevitably yielded the evidence. We again stress the astute observation of our Court of Appeals: "The inevitable discovery doctrine 'is not intended to swallow the exclusionary rule whole *by substituting what the police should have done for what they really did*.' "

*Id.* (citations omitted and emphasis added). Critically, because the police failed to secure a search warrant, the investigation was rendered unlawful from its inception. *Id.* at 908, 454 P.3d at 550. Thus, there was no evidence of any legal path which would have yielded the evidence. *Id.*

Campbell and the amicus argue that this Court's approach in our initial opinion on appeal, and presumably that of the Ninth Circuit, is a drastic departure from Idaho precedent established in *Maxim*, and will cause the Fourth Amendment to "be a dead letter in Idaho." The State responds that *Maxim* is distinguishable from the present case because the police misconduct occurred at different points in each respective investigation. We are more persuaded by the State's argument.

In cases like *Maxim*, when an investigation is constitutionally tainted from the start, only an independent parallel investigation can sufficiently sever it from the illegal conduct so that law enforcement may legally discover the evidence. Here, unlike in *Maxim*, the trooper had independent reasonable suspicion that a crime had been committed when he observed two motorcycles without license plates and noticed that one had been spray painted. Before he followed the suspects into the convenience store, he confirmed through dispatch that the painted motorcycle had been reported as stolen. Thus, the trooper had already begun a lawful investigation before any illegality occurred. This is vastly different from the facts in *Maxim* where all the evidence was gathered as a direct result of unlawful activity and there was no preceding or independent path aside from the tainted investigation. 165 Idaho at 909–10, 454 P.3d at 551–52.

In conclusion, *Maxim* and *Downing* represent two cases where an active, independent line of investigation was necessary to show that the evidence would have been inevitably discovered apart from unlawful police activity because the unlawful conduct occurred at the inception of the investigations. However, as discussed above, these holdings do not require a completely separate investigation in *every* case. Unlike the case at hand, there were no compelling facts in *Maxim* or *Downing* establishing that the disputed evidence inevitably would have been discovered absent the police misconduct.

      c.   Applying the proper standard, the evidence Campbell wishes to suppress would have been inevitably discovered independent of the intervening unlawful police conduct.

Having established that an independent investigation is not the only pathway to applying the inevitable discovery doctrine, we turn to the arguments regarding its application to the current case. The State is correct that the question is not "whether discovery was inevitable apart from the *encounter* with Campbell," but "whether discovery was inevitable apart from the *alleged illegality*—the handcuffing that created the purported de facto arrest." (Emphasis in original). It is undisputed that the trooper had authority and reasonable suspicion to conduct an investigative detention based on his discovery that the motorcycle was stolen. Both parties delve into

hypotheticals of whether the trooper would have inquired into Campbell's probation status, but the district court's early finding on this issue holds true: "If [the trooper] had just detained [Campbell], without handcuffing him, he would have discovered that he was on probation and had signed a Fourth Amendment waiver, as soon as he conducted the relevant inquiries." Inasmuch as we agree with this finding of the district court, we affirm its decision to suppress, albeit on a different theory.

Importantly, in conducting an inevitable discovery analysis, some conjecture by this Court is unavoidable in determining what "inevitably would have been discovered" had the illegality not occurred. *See Downing*, 163 Idaho at 31, 407 P.3d at 1290 (quoting *Nix*, 467 U.S. at 444). Of course, such conjecture may not be based on mere speculation. Rather, it must be based on "demonstrated historical facts capable of ready verification or impeachment," as required by *Nix*. 467 U.S. at 444 n.5. In the case now before us, this is demonstrated by logically following the path that was taken. The fork in the road occurred at the point the trooper entered the convenience store and (1) ordered the defendant to get on the ground and (2) placed him in handcuffs. This is when an illegal de facto arrest took place. Assuming the trooper had merely detained and questioned Campbell without making a de facto arrest, the trooper would have still inevitably learned Campbell's name and called it in to dispatch. Then, the trooper would have inevitably discovered that Campbell was on probation. Next, just as occurred, the trooper would have inevitably contacted Campbell's probation officer to report that Campbell was being detained during the investigation into a possible felony (a stolen vehicle). Under these circumstances, we conclude that the probation officer would have inevitably authorized a search of the backpack. This depiction of the steps that would have inevitably occurred is neither conjecture nor speculation because this is what actually occurred, and *the de facto arrest did nothing to facilitate any of these steps*.

Despite Campbell's assertion that there is no evidence of what would have happened without the de facto arrest, the record is clear that the trooper still would have discovered that Campbell was on probation. The trooper testified that pursuant to his investigatory detention, he asked for Campbell's name and called it in to dispatch, as he always does. Through dispatch, he discovered that Campbell was on probation and called the on-call probation officer, which he testified was part of his normal routine. He further testified that he always identifies each individual during an investigation, so that he can log it into an accurate report. None of these actions are tied exclusively to his decision to place Campbell in handcuffs. This series of events would have

occurred regardless of the de facto arrest or the discovery of the loaded magazine on Campbell's companion. In sum, logic and the "historical facts capable of ready verification or impeachment" all establish that the evidence Campbell wishes to suppress would have been inevitably discovered. *Nix*, 467 U.S. at 444 n.5.

Contrary to Campbell's claim that this conclusion is "the definition of speculation," it would require much more speculation to imagine a reality where these events would *not* have occurred. Indeed, given the undisputed facts in the record, it is difficult to fathom an alternate path where the trooper would *not* have learned Campbell's name, would *not* have discovered that he was on felony probation, and would *not* have contacted his probation officer. Upon being made aware that Campbell was the subject of a felony investigation, it is highly unlikely that any probation officer would *not* have authorized a search of Campbell's backpack. The fact that Campbell happened to be handcuffed when each of these steps were taken does not undermine the conclusion that they would have inevitably occurred regardless of whether a de facto arrest had taken place. Thus, it is not a matter of mere speculation but of reasoned judgment, based on the historic facts in the record, for us to conclude that law enforcement would have discovered the same evidence in Campbell's backpack under either path branching from the moment the trooper walked into the convenience store.

Under these circumstances, the inevitable discovery doctrine—a well-established exception to the Fourth Amendment warrant requirement—makes suppression of the evidence improper. While the district court ultimately admitted the evidence under an attenuation analysis, its analysis appears at times to have conflated inevitable discovery with attenuation—rejecting one Fourth Amendment exception for the other. Inasmuch as the inevitable discovery issue was preserved, and that exception squarely applies to the facts of this case, we conclude that the district court reached the correct conclusion that the evidence from Campbell's backpack should have been admitted, albeit by the wrong theory. "Where an order of a lower court is correct, but based upon an erroneous theory, the order will be affirmed upon the correct theory." *State v. Hoskins*, 165 Idaho 217, 222, 443 P.3d 231, 236 (2019) (quoting *Andre v. Morrow*, 106 Idaho 455, 459, 680 P.2d 1355, 1359 (1984)). Accordingly, we affirm the district court's order denying Campbell's suppression motion on the alternate theory of inevitable discovery.

Because our ruling is based on the inevitable discovery doctrine, which is dispositive of the case at hand, we need not address Campbell's argument that the federal test for attenuation is inconsistent with Idaho's constitutional protections.

## IV. CONCLUSION

We conclude that the district court did not err in denying Campbell's motion to suppress, notwithstanding its application of the wrong theory. Because the inevitable discovery doctrine plainly applies to the facts of this case, we affirm the order of the district court and Campbell's resulting judgment of conviction.

Chief Justice BEVAN, Justices BRODY and MEYER CONCUR.


ZAHN, J., dissenting.

I fully concur in Sections III.A and III.B of the majority opinion. However, I respectfully dissent from Section III.C of the opinion, which affirms the district court's order denying Campbell's motion to suppress on the basis of inevitable discovery, which was not the basis for the district court's decision. I would conclude that the State's inevitable discovery argument was not properly preserved, would decline to address it, and would reverse the district court's decision on the basis that it erred in concluding that the attenuation doctrine applied here.

The State concedes that it did not raise inevitable discovery below. As a result, whether the argument is properly preserved for appeal turns on whether the trial court issued <u>an adverse ruling</u>. The majority opinion ignores the word "adverse" and substitutes "definitive" in its place, essentially holding that a statement by the district court, which did not form the basis for its decision denying Campbell's motion, was sufficient to preserve the issue for appeal. That is not the holding in *State v. Miramontes*, 170 Idaho 920, 517 P.3d 849 (2022), and is not a faithful application of our preservation jurisprudence.

The purported "definitive ruling" that the majority opinion relies upon is a single sentence contained in a footnote. That footnote is connected to the district court's analysis concerning the legality of handcuffing Campbell and placing him in the back of the trooper's car:

> At the time of the defendant's arrest (placement in handcuffs and placing him in the patrol car), [the trooper] did not know that the defendant was on probation. Consequently, pursuant to *Maxim*, the defendant's Fourth Amendment waivers do not assist [the trooper], in terms of the authorization for his arrest.[12]

Footnote 12 contains the alleged "definitive ruling" concerning the inevitable discovery exception:

[12] The inevitable discovery doctrine also does not assist the State here since there is no indication that there was a parallel path by which the drug evidence would have been discovered, apart from [the trooper's] encounter with the defendant. *See* [*State v. Maxim*, 165 Idaho 901, 909, 454 P.3d 543, 551 (2019)] ("Here, if we put the police in the same position they would be in without the police misconduct, the police are left with no other investigatory wheels in motion. As we have stated on prior occasions, 'the inevitable discovery exception does not permit us to speculate on the course of action the investigation could have taken in the absence of (the Constitutional violation)—even if that alternate course likely would have yielded the evidence.' [*State v. Downing*, 163 Idaho 26, 32, 407 P.3d 1285, 1291 (2017)]. A police investigation often takes branching paths. The inevitable-discovery doctrine presupposes parallel paths leading toward the inevitable discovery of evidence. If, because of illegal police action, one path arrives at the evidence before the other does, then the State will be permitted to prove that the existing alternative path would have yielded the evidence even if the existing alternative path was cut short due to the discovery of the evidence. However, the split in the investigation which creates these parallel paths must occur *prior to or independent of* the illegality, not because of it. The question is not what legal path the police would have inevitably taken which could have yielded the evidence. The question is what legal path the police actually took which would have inevitably yielded the evidence. We again stress the astute observation of our Court of Appeals: 'The inevitable discovery doctrine 'is not intended to swallow the exclusionary rule whole by substituting what the police should have done for what they really did.' *Id.* (quoting *State v. Holman*, 109 Idaho 382, 392, 707 P.2d 493, 503 (Ct. App. 1985)) (internal quotation marks and alterations omitted). The question becomes whether the State can prove that the evidence in question would have been inevitably discovered even if the policy illegality is removed from the equation. The State did not meet this burden. Here, unlike *Nix*, there was no parallel path which would have led to the discovery of the evidence. There were no investigatory efforts aimed at Maxim.") (emphasis in original).

Only the first sentence of the footnote contains the district court's words. The remainder is an explanatory parenthetical that block quotes our decision in *Maxim*. When put in context, this single sentence by the district court is merely an aside. The district court's observation was so unrelated to its discussion that the observation was relegated to a footnote. It was not a definitive ruling on anything, much less an adverse ruling that formed the basis of Campbell's appeal.

Once Campbell established that: (1) he was subjected to an illegal de facto arrest and (2) a factual nexus existed between the illegal arrest and the State's acquisition of the evidence he sought to suppress, the burden shifted to the State to demonstrate an exception applicable to the exclusionary rule. *State v. Vivian*, 171 Idaho 79, 83–84, 518 P.3d 378, 382–83 (2022). The only exception argued by the State was the attenuation doctrine. That doctrine was the sole basis for the

district court's adverse ruling that is the subject of this appeal. As a result, that is the only theory properly preserved for appeal.

The majority opinion misapplies the "adverse ruling" standard from our preservation caselaw to decide Campbell's appeal based on a theory that was not advanced by the State below, to which Campbell did not have an opportunity to present evidence or argument, and which did not form the basis for the district court's adverse ruling denying Campbell's motion to suppress. As a result, Section III.C of the majority opinion fails to properly apply our preservation jurisprudence. I therefore respectfully dissent from Section III.B of the majority opinion.